[Cite as *Dietz v. Harshbarger*, 2017-Ohio-2917.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

PAUL DEITZ, ET AL.,

    PLAINTIFFS-APPELLANTS,          CASE NO. 17-16-21

    v.

HENRY L. HARSHBARGER, ET AL.,        O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Shelby County Common Pleas Court
Trial Court No. 14CV000145

**Judgment Affirmed**

**Date of Decision: May 22, 2017**

APPEARANCES:

    *Thomas W. Kerrigan, II and Royce A. Link* for Appellants

    *Bryan J. Mahoney* for Appellees

**PRESTON, P.J.**

{¶1} Plaintiffs-appellants, Paul Deitz ("Paul"), in his individual capacity and as the personal representative of the estate of Christina Deitz ("Christina"), and Alexis Deitz ("Alexis") (collectively "plaintiffs"), appeal the July 24, 2015 decision of the Shelby County Court of Common Pleas granting summary judgment in favor of defendant-appellant, the Franklin Township Board of Board of Trustees of Shelby County, Ohio (the "Board of Trustees"). For the reasons that follow, we affirm.

{¶2} This case stems from a negligence and wrongful death complaint filed by plaintiffs on June 26, 2014 alleging that defendants-appellees, the Board of Trustees, Henry Harshbarger and Elizabeth Harshbarger (the "Harshbargers"), the Shelby County Board of Commissioners (the "Commissioners"), and Paradise Acres, LTD ("Paradise"), negligently caused the death of Christina and severe injury to Alexis. (Doc. No. 1). Plaintiffs' complaint also names as a party to the case Nationwide Insurance Co. ("Nationwide") since it "may claim an interest in the * * * matter by virtue of making payment of medical or funeral expenses on behalf of" Christina or Alexis. (*Id.*). On June 29, 2012, Christina and her daughter, Alexis, were traveling northbound on Scott Road, a roadway situated in Franklin Township, of Shelby County, Ohio, and were involved in a two-vehicle accident at

the intersection of Scott Road and Sharp Road.[1]  (*Id.*); (Doc. No. 206).  Christina, who was operating the motor vehicle, failed to stop at a stop sign at the intersection and collided with another vehicle.  (Doc. No. 1).  Christina allegedly did not see the stop sign because the stop sign controlling northbound traffic on Scott Road was allegedly obscured by tree foliage.  (*Id.*); (Doc. No. 206).  The property on which the trees were growing is owned by the Harshbargers.  (Doc. No. 206).  It was further alleged that the intersection was obstructed by a corn field located on the southwest quadrant of the intersection.  (*Id.*).  The property on which the corn was growing is owned by Paradise.  (*Id.*).

{¶3} On July 23, 2014, the Commissioners and Paradise filed its answers. (Doc. Nos. 12, 15).  The Board of Trustees filed its answer on July 25, 2014.  (Doc. No. 18).  On July 30, 2014, the Harshbargers filed their answers.  (Doc. Nos. 23, 24).  That same day, the Harshbargers filed a motion, which was granted by the trial court, requesting that the trial court transfer discovery from Case Number 13CV000233, which raised the same issues and was voluntarily dismissed without prejudice by plaintiffs.  (Doc. Nos. 20, 25).  Also on July 30, 2014, Nationwide filed its answer and cross-claim against the Harshbargers, the Board of Trustees, the Commissioners, and Paradise.  (Doc. No. 22).

---

[1] Scott Road is a township road and its maintenance is managed by the Board of Trustees.  Sharp Road is a county road and maintenance is managed by the Commissioners.

{¶4} The Board of Trustees filed its answer to Nationwide's cross-claim on August 5, 2014. (Doc. No. 31). On August 14, 2014, Paradise filed its answer to Nationwide's cross-claim. (Doc. No. 44). On August 28, 2014, the Harshbargers filed their answer to Nationwide's cross-claim. (Doc. No. 62).

{¶5} On August 20 and 25 2014, the Commissioners filed motions to dismiss under Civ.R. 12(B)(6) Nationwide's cross-claim, which the trial court granted on October 20, 2014. (Doc. Nos. 46, 57, 85).

{¶6} On October 17, 2014, plaintiffs filed a motion to dismiss under Civ.R. 41(A)(1) Nationwide as a defendant to the case. (Doc. No. 84).

{¶7} On November 10, 2014, Nationwide filed a motion to dismiss without prejudice its cross-claims against the Harshbargers, the Board of Trustees, the Commissioners, and Paradise. (Doc. No. 98).

{¶8} On April 8, 2014, the Commissioners filed a motion for summary judgment asserting that there is no genuine issue of material fact that it is immune from liability. (Doc. No. 166). On April 23, 2015, the Harshbargers filed a motion for summary judgment asserting that there is no genuine issue of material fact that they did not contribute to plaintiffs' injuries and did not breach any duty they owed to plaintiffs. (Doc. No. 173). On May 21, 2015, the Board of Trustees filed a motion for summary judgment asserting that there is no genuine issue of material fact that the Board of Trustees did not breach any duty owed to plaintiffs; no act or omission

caused the accident; and the Board of Trustees are immune from liability under R.C. 2744.01. (Doc. No. 210). Paradise filed a motion for summary judgment on May 27, 2015. (Doc. No. 214).

{¶9} On May 18, 2015, plaintiffs filed memorandums in opposition to the Commissioners' and the Harshbargers' motions for summary judgment. (Doc. Nos. 206, 207). Plaintiffs filed memorandums in opposition to the Board of Trustees' and Paradise's motions for summary judgment on June 10, 2015. (Doc. Nos. 226, 228).

{¶10} On May 26, 2015, the Commissioners filed its response to plaintiffs' memorandum in opposition to the Commissioners' motion for summary judgment. (Doc. No. 212). The Harshbargers filed their response to plaintiffs' memorandum in opposition to the Harshbargers' motion for summary judgment on May 28, 2015. (Doc. No. 216). On June 17, 2015, the Board of Trustees filed its response to plaintiffs' memorandum in opposition to the Board of Trustees' motion for summary judgment. (Doc. No. 237). On June 22, 2015, Paradise filed its response to plaintiffs' memorandum in opposition to Paradise's motion for summary judgment. (Doc. No. 242). After having been granted leave by the trial court on July 13, 2015, the Commissioners filed a "supplemental reply brief" on June 18, 2015. (Doc. Nos. 239, 253). On June 25, 2015, the Harshbargers filed an amended

response to plaintiffs' memorandum in opposition to the Harshbargers' motion for summary judgment. (Doc. No. 245).

{¶11} On July 24, 2015, the trial court granted summary judgment in favor of Paradise, the Board of Trustees, and the Commissioners. (Doc. Nos. 261, 262, 263). That same day, the trial court denied the Harshbargers' motion for summary judgment. (Doc. No. 264).

{¶12} Plaintiffs filed notices of appeal on August 17, 2015 of the trial court's decisions granting summary judgment in favor of Paradise, the Board of Trustees, and the Commissioners. (Doc. Nos. 271, 273, 275). On September 18, 2015, this court dismissed plaintiffs' appeals because we lacked jurisdiction to consider them.

{¶13} On September 24, 2015, the trial court dismissed Paradise, the Board of Trustees, and the Commissioners as parties to the case. (Doc. No. 291).

{¶14} After the Harshbargers reached a settlement with Alexis, the trial court dismissed with prejudice Alexis's claims against the Harshbargers on July 18, 2016. (Doc. No. 341). On August 24, 2016, the trial court dismissed with prejudice Paul's claims in his individual capacity and in his capacity as the personal representative of Christina's estate against the Harshbargers after the parties reached a settlement. (Doc. No. 346).

{¶15} Plaintiffs filed their notice of appeal on September 15, 2016 from the July 24, 2015 entry granting summary judgment in favor of the Board of Trustees. (Doc. No. 351). They raise one assignment of error for our review.

### Assignment of Error

**The Trial Court Erred in Granting Summary Judgment to the Defendant/Appellee, the Frankling [sic] Township Board of Trustees, of Shelby County, Ohio, on its Claim of Government Immunity**

{¶16} In their assignment of error, plaintiffs argue that the trial court erred by granting summary judgment in favor of the Board of Trustees because an exception applies to the general rule that political subdivisions enjoy immunity while engaging in either governmental or proprietary functions. In particular, plaintiffs argue that the trial court erred by concluding that the Board of Trustees is "immune from liability for failing to remove the obstruction blocking the view of the stop sign controlling Scott Road," and erred by concluding that the Board of Trustees is "immune [from liability] for failing to properly maintain the stop ahead sign on Scott Road." (Appellant's Brief at 3).

{¶17} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-

moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

**{¶18}** "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

**{¶19}** "R.C. Chapter 2744 governs political subdivision tort liability and immunity." *Brady v. Bucyrus Police Dept.*, 194 Ohio App.3d 574, 2011-Ohio-2460, ¶ 44 (3d Dist.). To determine whether a political subdivision is entitled to immunity under R.C. Chapter 2744, a court must apply a three-tiered analysis. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 13. Under the first tier, a court must determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with either a governmental or a proprietary function. R.C. 2744.02(A)(1); *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, ¶ 14. Although political subdivisions are generally

immune from liability incurred in performing a governmental or proprietary function, that immunity is not absolute. R.C. 2744.02(B); *Cramer* at ¶ 14. "'The second tier of the analysis requires the court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability.'" *Cramer* at ¶ 15, quoting *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998). "'If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability.'" *Id.* at ¶ 16, quoting *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, ¶ 7-9.

{¶20} "Under the Political Subdivision Tort Liability Act, immunity is an affirmative defense." *Green v. Columbus*, 10th Dist. Franklin No. 15AP-602, 2016-Ohio-826, ¶ 18, citing *Slane v. Hilliard*, 10th Dist. Franklin No. 15AP-493, 2016-Ohio-306, ¶ 30, citing *Jones v. Lucas Metro. Hous. Auth.*, 6th Dist. Lucas No. L-96-212, 1997 WL 543049, *1 (Aug. 29, 1997) and *Haynes v. Franklin*, 135 Ohio App.3d 82 (12th Dist.1999). "Accordingly, the burden of proof is on the political subdivision to establish general immunity." *Id.*, citing *Slane* at ¶ 30, and citing *Browning v. Fostoria*, 3d Dist. Seneca No. 13-09-28, 2010-Ohio-2163, ¶ 18 and *Horen v. Bd. of Edn. of Toledo Pub. Schools*, 6th Dist. Lucas No. L-09-1143, 2010-

Ohio-3631, ¶ 33. The parties do not dispute that the Board of Trustees are entitled to general immunity under R.C. 2744.02(A)—that is, the parties agree that Franklin Township is a political subdivision under R.C. 2744.01(F)(1) and that Christina's death occurred in connection with a governmental function as defined by R.C. 2744.01(C)(2)(e). *See Yonkings v. Pinwinski*, 10th Dist. Franklin Nos. 11AP-07 and 11AP-09, 2011-Ohio-6232, ¶ 19.

{¶21} "When a political subdivision establishes general immunity, the burden then shifts to the plaintiff to demonstrate that one of the exceptions to immunity applies." *Green* at ¶ 19, citing *Slane* at ¶ 30, and citing *Maggio v. Warren*, 11th Dist. Trumbull No. 2006-T-0028, 2006-Ohio-6880, ¶ 38 and *Brady*, 194 Ohio App.3d 574, 2011-Ohio-2460, at ¶ 24. R.C. 2744.02(B) provides the following exceptions to the general immunity rule, in relevant part:

> Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
>
> * * *
>
> (3) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to

person or property caused by their *negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads*.

(Emphasis added).  Plaintiffs advance two theories that they argue strip the Board of Trustees from immunity under R.C. 2744.02(B)(3)—that the stop sign and stop-ahead sign at issue in this case fall under the definition of "public roads," and that the Board of Trustees negligently failed to remove foliage that was obstructing the stop sign or that the Board of Trustees negligently failed to keep the public road in repair by placing the stop-ahead sign at the distance from the stop sign recommended by the Ohio Manual of Traffic Control Devices ("OMUTCD").  We will first address plaintiffs' arguments relative to the stop sign, followed by plaintiffs' arguments relative to the stop-ahead sign.

{¶22} "Public Roads" are defined as "public roads, highways, streets, avenues, alleys, and bridges within a political subdivision. 'Public roads' does not include berms, shoulders, rights-of-way, or traffic control devices unless the traffic control devices are mandated by the Ohio manual of uniform traffic control devices." R.C. 2744.01(H).[2]  Accordingly, our first inquiry is whether the stop sign at issue in this case was mandated by the OMUTCD.

---

[2] The Ohio Department of Transportation adopted the Ohio Manual of Traffic Control Devices as required by R.C. 4511.09. *See Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 4.  R.C. Chapter 4511 governs Ohio's traffic laws and includes "stop signs" in the definition of "traffic control devices."  R.C. 4511.01(QQ). *See also Walters v. Columbus*, 10th Dist. Franklin No. 07AP-917, 2008-Ohio-4258, ¶ 11.

{¶23} Based on the time of the accident, the relevant edition of the OMUTCD is the 2012 edition. "The 2012 version of the OMUTCD, like the prior versions, contains headings to classify the nature of the text that follows." *Pelletier v. Campbell*, 7th Dist. Mahoning No. 15 MA 0220, 2016-Ohio-8097, ¶ 13. "OMUTCD Section 1A.13 provides the definitions for headings, words, and phrases used in the manual. There are four headings—Standard, Guidance, Option, and Support." *Id.* "Text classified as Standard includes a 'required, mandatory, or specifically prohibited practice regarding a traffic control device.'" *Id.*, quoting OMUTCD, Section 1A.13(A) (2012 Ed.). "The definition notes that the verb 'shall' is typically used and that the text appears in bold type." *Id.*, citing OMUTCD, Section 1A.13(A) (2012 Ed.). Text classified as Guidance includes "a statement of recommended, but not mandatory, practice in typical situations." OMUTCD, Section 1A.13(B) (2012 Ed.). The definition of Guidance notes that the verb "should" is typically used and that the verbs "shall" and "may" are not used in Guidance statements. *Id.*

{¶24} Section 2B.04 of the OMUTCD, titled Right-of-Way at Intersections, provides, in relevant part,

ORC Section 4511.41 * * * establishes the right-of-way rule at intersections having no regulatory traffic control signs such that the driver of a vehicle approaching an intersection must yield the right-

of-way to any vehicle or pedestrian already in the intersection. * * *
The right-of-way can be modified at through streets or highways by
placing YIELD * * * signs * * * or STOP * * * signs (see Sections
2B.05 through 2B.07) on one or more approaches. * * *

*Guidance*

*\* \* \**

*YIELD or STOP signs should be used at an intersection if one or more*
*of the following conditions exist:*

*A.   An intersection of a less important road with a main road where*
*application of the normal right-of-way rule would not be expected to*
*provide reasonable compliance with the law;*

*B.   A street entering a designated through highway or street; and/or*

*C.   An unsignalized intersection in signalized area.*

(Italics sic.)  OMUTCD, Section 2B.04 (2012 Ed.).  Based on that language, the

stop sign at issue in this case is discretionary—that is, the OMUTCD provides

guidance, not a standard, for when a stop sign like the one in this case should, not

shall, be erected.

{¶25} However, plaintiffs argue that the stop sign at issue in this case was

mandated by the OMUTCD.  In support of their argument, plaintiffs point to Section

2B.05 of the OMUTCD, titled **STOP Sign (R1-1) and ALL WAY Plaque (R1-**

**3P**).  (Bold sic.)  That section provides, in relevant part, "**When it is determined that a full stop is always required on an approach to an intersection, a STOP * * * sign * * * shall be used**."  (Bold sic.)  OMUTCD, Section 2B.05 (2012 Ed.).

{¶26} Plaintiffs contend that "once the determination has been made [to place the stop sign] the manual states that a stop sign becomes mandated and therefore, a part of the roadway for the immunity analysis."  (Appellant's Brief at 6).  However, this argument has been rejected by other courts of appeal.  *See, e.g.*, *Walters v. Columbus*, 10th Dist. Franklin No. 07AP-917, 2008-Ohio-4258, ¶ 20.  In *Walters*, the Tenth District Court of Appeals analyzed,

the General Assembly explicitly excluded traffic control devices from the definition of a "public road" unless the traffic control device was mandated by the OMUTCD.  By its clear language, it is evident that the General Assembly did not intend all erected traffic control devices to be considered part of a public road.  Yet, such would be the result if [Walters's] position was accepted.  The statute clearly distinguishes between traffic control devices that are, and traffic control devices that are not, mandated by the OMUTCD.

*Id.* That the Tenth District construed a prior version of the OMUTCD in its analysis in *Walters* does not change the outcome in this case because the 2012 version contains substantially similar guidance and standard language regarding stop signs.[3]

**{¶27}** In *Franks v. Lopez,* the Supreme Court of Ohio interpreted former R.C. 2744.02(B)(3), which provided that "political subdivisions are liable for injury caused 'by their failure to keep public roads, highways, [and] streets * * * within the political subdivisions open, in repair, and free from nuisance.'" 69 Ohio St.3d 345, 347 (1994), quoting R.C. 2744.02(B)(3) (1989) (current version at R.C. 2744.02(B)(3) (2007)). "The court held that the failure of a township to maintain a traffic sign may constitute an actionable nuisance claim within the exception." *Green*, 2016-Ohio-826, at ¶ 20, citing *Franks* at 348.

> In so holding, the court stated: "Overhanging branches and foliage
>
> which obscure traffic signs, malfunctioning traffic signals, signs

---

[3] Section 2B.04, titled "**STOP Sign (R1-1)**," provides:
> **Standard:**
> **When a sign is used to indicate that traffic is always required to stop, a STOP (R1-1) sign * * * shall be used.**

(Bold and capitalization sic.)  OMUTCD, Section 2B.04 (2005 Ed., Revision 2).
Section 2B.05, titled "**STOP Sign Applications**," provides:
> Guidance:
> STOP signs should be used if engineering judgment indicates that one or more of the following conditions exist:
> A. Intersection of a less important road with a main road where application of the normal right-of-way rule would not be expected to provide reasonable compliance with the law;
> B. Street entering a through highway or street (O.R.C. Section 4511.65 provides information on through highways (see Appendix B2));
> C. Unsignalized intersection in a signalized area; and/or
> D. High speeds, restricted view, or crash records indicate a need for control by the STOP sign.

(Bold sic.)  OMUTCD, Section 2B.05 (2005 Ed., Revision 2).

which have lost their capacity to reflect, or even physical impediments such as potholes, are easily discoverable, and the elimination of such hazards involves no discretion, policy-making or engineering judgment. The political subdivision has the responsibility to abate them and it will not be immune from liability for its failure to do so."

*Id.*, quoting *Franks* at 349.

{¶28} The General Assembly amended R.C. Chapter 2744 in 2003 subsequent to *Franks*. The General Assembly's 2003 amendments added the definition of public roads under R.C. 2744.01(H), and removed the nuisance language from R.C. 2744.02(B)(3) and replaced it with the current "obstruction" language. *Green* at ¶ 21, citing *Walters* at ¶ 17.

{¶29} "In *Howard v. Miami Twp. Fire Div.*, the Supreme Court specified that 'the legislature's action in amending R.C. 2744.02(B)(3) was not whimsy but a deliberate effort to limit political subdivisions' liability for injuries and deaths on their roadways.'" *Id.* at ¶ 22, quoting 119 Ohio St.3d 1, 2008-Ohio-2792, ¶ 26.

The Supreme Court continued: "Given the General Assembly's prior inclusion of the same language in Am.Sub.H.B. No. 350, our precedent that broadly defines the term 'nuisance,' and that S.B. 106 also limited the definition of 'public roads' from a more expansive reading that included 'berms, shoulders, rights-of-way, or traffic

control devices' to one that focused solely on the roadway itself, * *

* we discern a legislative intent to limit political-subdivision liability

for roadway injuries and deaths. The General Assembly, in

furtherance of its goal, used the word 'obstructions' in a deliberate

effort to impose a condition more demanding than a showing of a

'nuisance' in order for a plaintiff to establish an exception to

immunity."

*Id.*, quoting *Howard* at ¶ 29.  To say that a stop sign is mandated by the manual

because a stop sign is erected flies in the face of the General Assembly's intent.

"[T]he General Assembly explicitly excluded traffic control devices from the

definition of a 'public road' unless the traffic control device was mandated by the

OMUTCD."  *Walters* at ¶ 20.  "By its clear language, it is evident that the General

Assembly did not intend all erected traffic control devices to be considered part of

a public road."  *Id.*  Yet, if we are to accept plaintiffs' argument, every existing stop

sign would be included in the definition of a public road.  "The statute clearly

distinguishes between traffic control devices that are, and traffic control devices that

are not, mandated by the OMUTCD."  *Id.*

{¶30} This court addressed this issue under facts similar to those presented

by this case.  *Bibler v. Stevenson*, 3d Dist. Hancock No. 5-14-29, 2015-Ohio-3717.

In that case, Stevenson failed to stop at a stop sign, which was obscured by tree

foliage, at the intersection of East Sandusky Street and Wilson Street in Findlay, Ohio and collided with Bibler. *Id.* at ¶ 2. This court concluded that the city of Findlay was immune from liability because the stop sign at issue in that case was not a public road since it was not mandated by the version of the OMUTCD in effect at the time of the accident.[4] *Id.* at ¶ 30. This court's decision was reversed by the Supreme Court of Ohio in a plurality decision after the plurality concluded that "[t]he stop sign in this case falls within the definition of a public road." ___ Ohio St.3d ___, 2016-Ohio-8449, ¶ 20. In reaching that conclusion, the plurality concluded that, notwithstanding the language of the version of the OMUTCD in effect at the time of the accident, the stop sign was mandated under R.C. 4511.65(A). *Id.* at ¶ 17.

{¶31} We need not and do not express any opinion on the effect of a plurality decision in this case because *Bibler* is distinguishable. Nonetheless, the plurality decision is instructive to our analysis. In *Bibler*, East Sandusky Street is also State Route 568. *See id.* at ¶ 12. Under Chapter 4511 of the Revised Code, state routes,

> [o]ther streets or highways, or portions thereof are * * * through highways if they are within a municipal corporation, if they have a continuous length of more than one mile between the limits of said street or highway or portion thereof, and if they have "stop" or "yield"

---

[4] OMUTCD (2005 Ed., Revision 2)

signals at the entrances of the majority of intersecting streets or highways[,]

and other highways, under the jurisdiction of a local authority, that are designated a through highway by that local authority are through highways.[5]  R.C. 4511.65(A), (B), (D).  Because the intersection at issue in *Bibler* has a stop sign on Wilson Street, the plurality looked to R.C. 4511.11(A), which provides

Local authorities in their respective jurisdictions shall place and maintain traffic control devices in accordance with the department of transportation manual for a uniform system of traffic control devices, adopted under section 4511.09 of the Revised Code, upon highways under their jurisdiction as are necessary to indicate and to carry out sections 4511.01 to 4511.76 and 4511.99 of the Revised Code, local traffic ordinances, or to regulate, warn, or guide traffic.

R.C. 4511.65(A) provides that "stop signs, yield signs, or traffic control signals shall be erected at all intersections with such through highways * * * by local authorities as to highways under their jurisdiction."  The plurality reasoned that R.C. 4511.11(A) and R.C. 4511.65(A) "clearly contemplate the mandatory nature of stop signs or other traffic-control devices at intersections involving *through highways*."

---

[5] R.C. 4511.01 defines "through highway" as "every street or highway as provided in section 4511.65 of the Revised Code."  R.C. 4511.01(HH).

(Emphasis added.) *Bibler* at ¶ 14. Based on the plurality's analysis, traffic-control devices are mandated only at intersections involving through highways.

**{¶32}** There is no genuine issue of material fact that the roads at issue in this case are not through highways. That is, there is no allegation in the record that Sharp Road or Scott Road are a through highway as defined by the statute. *See* R.C. 4511.65. Stated differently, there is no allegation in the record that Sharp Road or Scott Road are a state route, within a municipal corporation, or have been designated a through highway.

**{¶33}** Because neither of the roads at issue in this case are through highways, neither the statute nor the OMUTCD mandate that a traffic-control device be erected at their intersection. *See Walters*, 2008-Ohio-4258, at ¶ 20; *Darby v. Cincinnati*, 1st Dist. Hamilton No. C-130430, 2014-Ohio-2426, ¶ 14, 20. *See also Green*, 2016-Ohio-826, at ¶ 25-26; *Yonkings*, 2011-Ohio-6232, at ¶ 25. Rather, the stop sign at issue in this case is discretionary. *Walters* at ¶ 20. Indeed, the manual defers to R.C. 4511.41 as the default rule for intersections not involving a through highway. *See* OMUTCD, Section 2B.04 (2012 Ed.). R.C. 4511.41(A) provides, "When two vehicles * * * approach or enter an intersection from different streets or highways at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right." From there, the OMUTCD provides guidance as to whether a stop sign should be erected on a road other than a through

highway. *See* OMUTCD, Section 2B.04 (2012 Ed.). *See also Darby* at ¶ 11-14. Construing the 2005 version of the OMUTCD, the First District Court of Appeals concluded that the OMUTCD "is devoid of any language indicating that stop sign placement at an intersection is ever mandated." *Darby* at ¶ 12, citing *Yonkings* at ¶ 24. The plurality of the Supreme Court similarly stated in *Bibler* regarding the 2005 version of the OMUTCD, "nothing in the version of the OMUTCD that was in place when the accident occurred specifically and affirmatively indicated that the erection of any stop sign is ever mandatory." *Bibler* at ¶ 14, citing OMUTCD, Section 2B.05 (2005 Ed., Revision 2) ("stating that stop signs 'should' be used in certain situations."). The same holds true for the 2012 version of the OMUTCD.

**{¶34}** Therefore, because the stop sign at issue in this case is not mandated under the statute or the OMUTCD, it is not included within the definition of a public road under R.C. 2744.02. *See Walters* at ¶ 23; *Green* at ¶ 26. As such, the immunity exception under R.C. 2744.02(B)(3) is not applicable, and the Board of Trustees is entitled to immunity under R.C. 2744.02(A). *See id.*; *id.* Because the stop sign at issue in this case is not included with the definition of a public road under the statute, we need not address whether the foliage was an obstruction that the Board of Trustees negligently failed to remove, or whether the Board of Trustees negligently

failed to keep the stop sign in repair.[6]

**{¶35}** In the alternative, plaintiffs argue that the Board of Trustees is liable because it failed to maintain the stop-ahead sign on Scott Road—namely, plaintiffs argue that the stop-ahead sign was improperly placed, which resulted in inadequate notice to Christina of the upcoming stop sign. Under this theory of political-subdivision liability, plaintiffs argue that the R.C. 2744.02(B)(3) exception to the general-immunity rule applies because the Board of Trustees negligently failed to keep a public road in repair by maintaining the stop-ahead sign in accordance with the OMUTCD.[7] In particular, plaintiffs argue that the stop-ahead sign should have been located 325 feet in advance of the stop sign, not 730 feet.

**{¶36}** Similar to our analysis above, for R.C. 2744.02(B)(3) to apply, the stop-ahead sign must be included within the definition of a public road under R.C. 2744.01(H). To be included in that definition, the stop-ahead sign must be a traffic control device that is mandated by the OMUTCD.[8] Construing the evidence in a light most favorable to the nonmoving party as we are required to do, if we assume without deciding that an exception to immunity applies under R.C. 2744.02(B)(3) regarding the stop-ahead sign, there is no genuine issue of material fact that the

---

[6] Although the Board of Trustees argue that "[t]he record already establishes that Shelby County and not Franklin Township was responsible for the stop sign," the party responsible for the stop sign itself does not change the analysis of whether the stop sign is included in the definition of a public road. Because our analysis ends with whether the stop sign in this case is included in the definition of a public road under the statute, we need not address the Board of Trustees' argument.

[7] It is undisputed that the stop-ahead sign is owned and maintained by Franklin Township.

[8] Under R.C. 4511.01, a stop-ahead sign is a traffic control device. *See* R.C. 4511.01 (QQ).

Board of Trustees failed to keep a public road in repair. Stated differently, there is no genuine issue of material fact whether the Board of Trustees kept the stop-ahead sign "in repair" within the meaning of R.C. 2744.02(B)(3).

{¶37} The phrase "in repair" is not defined by R.C. Chapter 2744. *Leslie v. Cleveland*, 8th Dist. Cuyahoga No. 101771, 2015-Ohio-1833, ¶ 14; *Lakota v. Ashtabula*, 11th Dist. Ashtabula No. 2015-A-0010, 2015-Ohio-3413, ¶ 26. However, this topic has been addressed by other courts. *See Sanderbeck v. Medina Cty.*, 130 Ohio St.3d 175, 2011-Ohio-4676, ¶ 30 (Lanzinger, J., dissenting); *Todd v. Cleveland*, 8th Dist. Cuyahoga No. 98333, 2013-Ohio-101, ¶ 15; *Lakota* at ¶ 26; *Leslie* at ¶ 14. To determine the meaning of the phrase "in repair," courts have looked to the Supreme Court of Ohio's interpretation of a former version of R.C. 305.12, "a statute authorizing suits against a board of county commissioners for failure to keep roads 'in proper repair.'" *Todd* at ¶ 15, citing *Heckert v. Patrick*, 15 Ohio St.3d 402, 406 (1984). *See also Sanderbeck* ¶ 31 (Lanzinger, J., dissenting). In interpreting that statute, the Supreme Court concluded that "'the intent of the General Assembly was to place a duty on the commissioners only in matters concerning either the *deterioration* or *disassembly* of county roads and bridges.'" (Emphasis added.) *Todd* at ¶ 15, quoting *Heckert* at 406. As such, the 'in repair' language under R.C. 2744.02(B)(3) has been interpreted as "maintaining a road's condition after construction or reconstruction, for instance by fixing holes and

crumbling pavement. It deals with repairs after deterioration of a road or disassembly of a bridge, for instance." *Bonace v. Springfield Twp.*, 179 Ohio App.3d 736, 2008-Ohio-6364, ¶ 29 (7th Dist.), citing *Heckert* at 406. *See Todd* at ¶ 15, quoting *Crabtree v. Cook*, 196 Ohio App.3d 546, 2011-Ohio-5612, ¶ 27 (10th Dist.), citing *Bonace* at ¶ 29. *See also Sanderbeck* at ¶ 13 (O'Donnell, J., dissenting), quoting *Webster's New World College Dictionary* (4th Ed.2000). "In repair" does not encompass the design or construction of roadways. *See Bonace* at ¶ 29; *Sanderbeck* at ¶ 15 (O'Donnell, J., dissenting), citing *Haynes v. Franklin*, 95 Ohio St.3d 344, 2002-Ohio-2334, ¶ 18; *Sanderbeck* at ¶ 31 (Lanzinger, J., dissenting).

**{¶38}** As a result, we conclude the placement of the stop-ahead sign in this case does not fall within the meaning of "in repair." That is, there is no genuine issue of material fact that the stop-ahead sign was deteriorated or disassembled. Rather, plaintiffs argue that the stop-ahead sign should have been placed at 325 feet in accordance with the OMUTCD, instead of the 730 feet at which it was placed. The placement of the stop-ahead sign in this case is more akin to a roadway design or construction. *See Sanderbeck* at ¶ 38 (Lanzinger, J., dissenting) (concluding that the "road's skid number" "relates only to a potential flaw in the road's design or construction rather than the failure to adequately maintain the road"). As such, we conclude that "in repair" does not create a duty to change the location of a stop-

ahead sign. *See Bonace* at ¶ 29 ("Consequently, 'in repair' does not create a duty to change allegedly absurd designs such as extreme and unnecessary side slopes that were constructed (and recently reconstructed) into a road.").

**{¶39}** Moreover, even if the placement of a stop-ahead sign is included within the phrase 'in repair' allowing the statutory exception to political-subdivision immunity, the Board of Trustees' immunity is restored by the discretion defenses under R.C. 2744.03(A). *See* R.C. 2744.03(A)(3), (5). *See also Franks*, 69 Ohio St.3d at 347 (noting that the defenses codified under R.C. 2744.03(A)(3) and (5) are known as the "discretion" defenses).

**{¶40}** "Under R.C. 2744.03, immunity abrogated by a R.C. 2744.02(B) exception can be reinstated if the political subdivision successfully argues that one of the defenses to liability set forth in R.C. 2744.03 applies." *Yonkings*, 2011-Ohio-6232, at ¶ 26, citing *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, ¶ 12. R.C. 2744.03 provides, in relevant part:

> In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
>
> * * *

(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.

* * *

(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

R.C. 2744.03(A)(3), (5).

**{¶41}** The Supreme Court of Ohio distinguished R.C. 2744.03(A)(3) from 2744.03(A)(5). *Elston*. The Supreme Court noted:

Although both R.C. 2744.03(A)(5) and 2744.03(A)(3) concern an employee's discretionary acts, the focus of subsection (A)(3) is that the employee be engaged in policy-making, planning, or enforcement. Also unlike R.C. 2744.03(A)(5), R.C. 2744.03(A)(3) does not have language limiting its grant of immunity. In other words, a political

subdivision may assert the immunity defense when an employee who has the duty and responsibility for policy-making, planning, or enforcement by virtue of office or position actually exercises discretion with respect to that power. This immunity exists even if the discretionary actions were done recklessly or with bad faith or malice.

*Id.* at ¶ 27.

**{¶42}** The Supreme Court applied the discretion defenses under R.C. 2744.03(A)(3) and 2744.03(A)(5) in *Franks*.[9] *Franks,* 69 Ohio St. 3d at 347-350. In that case, the Supreme Court concluded that "the defenses found in R.C. 2744.03(A)(3) and (5) preclude the imposition of liability on a political subdivision for any acts or omissions related to" "defective design and construction and the failure to install signage." *Id.* at 349-350. *See also Haynes v. City of Franklin*, 12th Dist. Warren No. CA2000-03-025, 2000 WL 1371000, *4 (Sept. 25, 2000), citing *Franks* at 349-350. However, "[i]n the context of political subdivision immunity for failure to maintain road signs, the Supreme Court of Ohio has stated:

---

[9] Although the Supreme Court of Ohio addressed former R.C. 2744.02(B)(3) in *Franks*, the court's application of the discretionary defenses under R.C. 2744.03(A)(3) and 2744.03(A)(5) remains applicable. *See, e.g.*, *Darby*, 2014-Ohio-2426, at ¶ 16-19 (discussing the applicability of *Franks* to the amended version of R.C. 2744.02(B)(3)); *Sanderbeck*, 130 Ohio St.3d 175, 2011-Ohio-4676, at ¶ 36 (Lanzinger, J., dissenting) (noting that the discretionary defenses under R.C. 2744.03(A)(3) and 2744.03(A)(5) remain applicable under "the current version of the statute" because "the principle remains" that "a political subdivision is immune from liability for design or construction defects because decisions on those matters involve discretion on the part of employees of a political subdivision"), citing *Franks* at 349-350 and *Haynes*, 95 Ohio St.3d 344, 2002-Ohio-2334, at ¶ 18.

> Overhanging branches and foliage which obscure traffic signs, malfunctioning traffic signals, signs which have lost their capacity to reflect, or even physical impediments such as potholes, are easily discoverable, and the elimination of such hazards involves no discretion, policy-making or engineering judgment. The political subdivision has the responsibility to abate them and it will not be immune from liability for its failure to do so."

*Miller v. State*, 10th Dist. Franklin No. 13AP-849, 2014-Ohio-3738, ¶ 33, quoting *Franks* at 349.

{¶43} Based on the application of the discretion defenses under R.C. 2744.03(A)(3) and 2744.03(A)(5), we hold that the location of the placement of the stop-ahead sign is akin to a defective design or construction or the failure to install signage—not an easily discoverable malfunctioning traffic signal or sign that has lost its capacity to reflect—for which the Board of Trustees is immune from liability. *See Haynes*, 95 Ohio St.3d 344, 2002-Ohio-2334, at ¶ 18 (noting that "the plaintiff must establish that the cause of the condition was other than a decision regarding design and construction" to avoid immunity); *Tiley v. Baltimore & Ohio R. Co.*, 2d Dist. Miami No. 88-CA-7, 1988 WL 110314, *5-6 (Oct. 20, 1988) ("Because placement of one or more advance warning signs is left to the discretion of local authorities, the decision regarding such placement is protected by immunity

from tort liability pursuant to *Winwood*. This is a decision which may be characterized as one 'requiring the consideration of basic policy and the exercise of independent judgment.'"), quoting and citing *Winwood v. City of Dayton*, 37 Ohio St.3d 282, 284 (1988); *Haynes,* 2000 WL 1371000, at *4 ("the placement, or nonplacement, of permanent signs are discretionary and subject to immunity"), citing *Franks* at 349 and *Jones v. City of Franklin*, 102 Ohio App.3d 114, 118 (12th Dist.1995). *See also Garland v. Ohio Dept. of Transp.*, 48 Ohio St.3d 10 (1990), paragraph one of the syllabus ("A governmental entity is immune from tort liability when it makes a decision as to what type of traffic control signal to install at an intersection."); *Sanderbeck*, 130 Ohio St.3d 175, 2011-Ohio-4676, at ¶ 36 (Lanzinger, J., dissenting). Indeed, the decision of where to locate the placement of an advance-warning sign necessarily involves "policy-making, planning, or enforcement" by the political subdivision because each intersection is differently situated. That is, considerations such as driveways, trees, or other monuments must be taken into account when determining where an advance-warning sign should be located to best serve the public interest.

{¶44} Moreover, that the location of the placement of a stop-ahead sign is discretionary under the OMUTCD is also indicative that the Board of Trustees is entitled to immunity under R.C. 2744.03(A)(3) or 2744.03(A)(5). "Compliance with the OMUTCD is an issue of law that this court can determine." *Darby*, 2014-

Ohio-2426, at ¶ 9, citing *Hopkins v. Porter*, 3d Dist. Mercer No. 10-13-17, 2014-Ohio-757, ¶ 61.

**{¶45}** Section 2C.05, titled **Placement of Warning Signs**, provides, in relevant part, "*Warning sings should be placed so that they provide an adequate [perception-response time]. The distances contained in Table 2C-4 are for guidance purposes and should be applied with engineering judgment.*" (Bold and italics sic.) (OMUTCD, Section 2C.05). Table 2C-4, titled, **Guidelines for Advance Placement of Warning Signs**, suggests that a warning sign, including stop-ahead signs, be placed 325 feet when the posted speed limit is 55 mph.[10] (Bold sic.) OMUTCD, Table 2C-4 (2012 Ed.). Based on that language, the placement of the stop-ahead sign is discretionary—that is, the OMUTCD merely provides guidance, not a standard, for where a stop-ahead sign, like the one in this case, should be placed. For these reasons, we conclude that the Board of Trustees is immune from liability.

**{¶46}** Plaintiffs' assignment of error is overruled.

**{¶47}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

---

[10] The speed limit on Scott Road is 55 mph. (*See* Doc. No. 1).

**WILLAMOWSKI, J., concurs in part and dissents in part.**

{¶48} I respectfully concur in part and dissent in part from the majority. In this case, I agree with both the legal reasoning and conclusion of the majority on the issues regarding the stop ahead sign. As to the stop sign, however, I am not persuaded by the legal reasoning of the majority that the trial court's grant of summary judgment was appropriate in this case.

{¶49} After examining the general analysis contained in the majority opinion, I am not convinced by the majority's approach in determining whether a given traffic control device is mandatory or discretionary under Ohio law. The majority makes the primary issue whether this particular type of traffic control device, i.e. a stop sign, is mandatory when the primary issue should be whether a traffic control device is mandatory. Generally, the Ohio Revised Code mandates that traffic control devices be placed in particular locations and lists several types of traffic control devices that can fulfill that mandate. *See* R.C. 4511.65. The OMUTCD also contains provisions that require governing authorities to erect traffic control devices in particular locations. A traffic control device that is mandated by either a statute or the manual is mandatory regardless of whether the responsible governing authority is given options as to which type of traffic control device may fulfill that mandate. Since governing authorities are required to erect a traffic control device in these locations, the choice of the type of traffic control device to

erect cannot make the traffic control device discretionary—the governing authority *must* erect traffic control devices in these locations, making these traffic control devices mandatory. *See Butler v. City Comm.*, 6th Dist. Erie No. E-10-026, 2011-Ohio-1143, ¶ 13.

{**¶50**} Thus, if a governing authority chooses to erect a stop sign at a location where a traffic control device is mandated by the Ohio Revised Code or the OMUTCD, that stop sign is mandatory even when the choice to erect another type of traffic control device—such as a yield sign or a stop light—would also have complied with the requirements of Ohio law. If the governing authority were to replace this stop sign with a stop light, the stop light would serve as the mandatory traffic control device for that location and would, therefore, be mandatory under Ohio law. For this reason, if a traffic control device is required in a particular location, the traffic control device selected for placement at that location is mandatory and is, therefore, part of the public road for the purposes of R.C. 2744.02(B)(3) and R.C. 2744.01(H).

{**¶51**} Turning to the facts of this case, we must, "[i]n reviewing a trial court's granting of summary judgment, * * * view all evidence in a light most favorable to the non-moving party." *Carnahan v. Morton Bldgs. Inc.*, 41 N.E.3d 239, 2015-Ohio-3528, ¶ 19 (3d Dist.). Applying this standard, I see two issues in the record that complicate the majority's decision to affirm the trial court's grant of

summary judgment.  First, I do not believe that the record presents sufficient evidence to conclude that the stop sign is not mandatory.  On appeal, the parties argue over whether the stop sign is mandatory and base their arguments largely on this court's decision in *Bibler v. Stevenson*, 2015-Ohio-3717, 38 N.E.3d 952, (3d Dist.), *rev'd by Bibler v. Stevenson*, --- Ohio St.3d ---, 2016-Ohio-8449, --- N.E.3d ---.  This court's decision in *Bibler* was issued after the trial court ruled on the motion for summary judgment that is now before us and was reversed by the Supreme Court of Ohio after the parties had submitted their briefs for this case.  *Id.* As a consequence, the issues argued on appeal are largely absent from the record below, and the trial court did not rule on whether this stop sign was mandatory.  Doc. 262.  Since neither party focused below on whether this stop sign was mandatory, the information submitted by the parties was not directed towards establishing whether the stop sign was mandatory or discretionary.

{¶52} Given the absence of this information in the record, my initial point of departure with the majority is how their analysis handles this dearth of information, especially with respect to several relevant statutory provisions. As a general principle, statutory provisions enacted by the General Assembly cannot be superseded by guidelines promulgated by administrative agencies.  *Bibler,* --- Ohio St.3d ---, 2016-Ohio-8449, --- N.E.3d ---, at ¶ 15.  While R.C. 2744.02(B)(3) and R.C. 2744.01(H) direct us to the "OMUTCD" to determine whether a stop sign is

mandatory or discretionary, the Ohio Revised Code also contains provisions that mandate the placement of stop signs in specified locations. *See* R.C. 4511.65. These provisions in the Revised Code must be read alongside the guidelines provided in the OMUTCD. If a stop sign is mandated by statute but is discretionary under the OMUTCD, the stop sign is mandatory as the statute necessarily overrides any contrary provision of the OMUTCD.

**{¶53}** In deciding whether a stop sign is mandatory and, therefore, part of a public road for the purposes of R.C. 2744.03(B)(3) and R.C. 2744.01(H), we need to be mindful not to treat the statutory provisions that mandate traffic control devices as an afterthought. Rather, we should give priority to these statutory provisions as we consider these issues. The majority examines the facts of this case under R.C. 4511.65(A) and the OMUTCD. However, the fact that a stop sign is not required under R.C. 4511.65(A) and the OMUTCD does not mean that the stop sign is not required. To hold that this stop sign is discretionary without the information required to determine whether this stop sign is mandated under, for example, R.C. 4511.65(D) is to deny the Ohio Revised Code the preeminent place that it should be accorded in this analysis. Based on the facts in this case, I am reluctant to rule on an issue that was not considered first by the trial court and then to make such a ruling based on inadequate information.

**{¶54}** Second, I am not persuaded that the trial court satisfactorily addressed

the allegations that overhanging foliage was obstructing the visibility of the stop sign. In its judgment entry, the trial court determined that the following exception to immunity, which is contained in R.C. 2744.02(B)(3), did not apply in this case:

**Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their * * * negligent failure to remove obstructions from public roads * * *.**

R.C. 2744.02(B)(3). Relying on several cases that address the duties of governing authorities in maintaining public roads, the trial court determined that the foliage that was allegedly blocking the view of the stop sign was not an obstruction within the meaning of 2744.02(B)(3) because an obstruction, under this provision, "must be an obstacle that blocks or clogs the roadway and not merely a thing or condition that hinders or impedes the use of the roadway or that may have the potential to do so." Doc. 262, quoting *Howard v. Miami Township Fire Division,* 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, ¶ 30. *Laurie v. City of Cleveland*, 8th Dist. Cuyahoga No. 91665, 2009-Ohio-869; *Crabtree v. Cook*, 196 Ohio App.3d 546, 2011-Ohio-5612, 964 N.E.2d 473 (10th Dist.). In *Howard*, however, "[t]he Supreme Court did not discuss the meaning of the word 'obstruction' as it might apply to a mandatory traffic control device." *Pelletier v. Campbell*, --- N.E.3d ---, 2016-Ohio-8097, ¶ 16 (7th Dist.).

{¶55} In R.C. 4511.01(EE), "[r]oadway" is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, except the

berm or shoulder * * *." R.C. 4511.01(EE). The definition of obstruction employed by the trial court is very appropriate for situations in which a plaintiff alleges that a physical barrier compromised their ability to traverse the roadway, thus causing an accident. The cases the trial court relied upon generally address this type of situation. This definition is not appropriate, however, for the situation presented in this case.

{¶56} Under R.C. 2744.02(B)(3), "political subdivisions are liable for injury, death, or loss to person or property caused by * * * negligent failure to remove obstructions from public roads * * *." The definition of "public roads" under R.C. 2744.01(H) is not limited to the roadway and includes mandatory traffic control devices. The clear intent of the General Assembly was to hold political subdivisions liable for the negligent failure to remove conditions obstructing mandatory traffic control devices and the roadway. The definition of obstruction employed by the trial court, however, covers only a subset of the obstructions contemplated by the statute—those obstructions that block the roadway.

{¶57} The General Assembly included mandatory traffic control devices in its definition of public roads, but the definition of obstruction used by the trial court, if applied beyond the roadway, essentially removes mandatory traffic control devices from the purview of this statute. The same definition for obstruction cannot be logically applied to both the roadway and mandatory traffic control devices.

When a roadway is blocked, the danger is that a motorist cannot drive past the obstruction and an accident will occur.  When a traffic control device—here a stop sign—is blocked, the danger is that the motorist will drive past the obstruction, unaware of the traffic control device, and an accident will occur.  Considering a traffic control device to be obstructed only when the roadway is impassable would leave a set of dangerous conditions in the public roads unaddressed—namely conditions that obstruct the traffic control devices.  Such a rule would absolve political subdivisions of liability where the General Assembly clearly intended these entities to bear responsibility.

{¶58} In 2003, the General Assembly did alter the language of 2744.02(B)(3), making political subdivisions liable for the "negligent failure to remove obstructions from public roads * * *," R.C. 2744.02(B)(3), where these entities had previously been responsible for "their failure to keep public roads * * * free from nuisance." *Howard*, *supra*, at ¶ 24, quoting R.C. 2744.02(B)(3), amended 149 Ohio Laws, Part II, 3500, 3508.  Through this change, the Ohio Supreme Court "discern[ed] a legislative intent to limit political-subdivision liability for roadway injuries and death." *Id*. at ¶ 29.  However, the General Assembly did not limit political subdivision liability by excluding all traffic control devices.  Thus, even under this more restrictive language, political subdivisions are still liable for failing to remove conditions obstructing mandatory traffic control devices.

**{¶59}** The facts of *Howard* are not analogous to the facts in this case, but in a case where foliage was alleged to have blocked a traffic control device, the Ohio Supreme Court, when interpreting R.C. 5579.08, found that the traffic control device could be obstructed by overhanging foliage. *White v. Ohio Dept. of Transp.*, 56 Ohio St.3d 39, 564 N.E.2d 462 (1990), paragraph two of the syllabus (holding "[a] township's duty to maintain its roads requires the use of reasonable care to ensure that foliage along the township roads does not obstruct a driver's view of traffic signs or signals.").[11] While *White* was addressing a different, independent statutory duty of townships under R.C. 5579.08, the Supreme Court determined that foliage can obstruct a traffic control device. Since R.C. 2744.02(B)(3) includes within its purview obstructions to mandatory traffic control devices, then it follows—under an interpretation of "obstruction" that is in accordance with its general usage—that a plaintiff can allege foliage obstructed a mandatory traffic control device and that the responsible governing authority negligently failed to remove this obstruction. Thus, the fact that the plaintiffs did not allege that a condition blocked the entire roadway does not mean there was no obstruction within the meaning of R.C. 2744.02(B)(3). Further, the question of whether the stop sign

---

[11] R.C. 5579.08 reads, in relevant part: "All brush, briers, burrs, vines, and noxious weeds growing along the public highway shall be cut or destroyed between the first and twentieth days of June, the first and twentieth days of August, and, if necessary, between the first and twentieth days of September of each year or whenever necessary to prevent or eliminate a safety hazard * * *." Even though foliage is not expressly mentioned in the statute, the Supreme Court has interpreted this provision to address the issue of overhanging foliage obstructing the view of traffic control devices. *White v. Ohio Dept. of Transp.*, 56 Ohio St.3d 39,42, 564 N.E.2d 462, 465-466 (1990).

was obstructed within the meaning of 2744.02(B)(3) remains a genuine issue of material fact.

{¶60} In conclusion, I believe that we are not able to determine whether the stop sign at issue is mandatory based upon the scant information contained in the record. Further, I believe the question of whether any overhanging foliage in this case was an obstruction remains unresolved. For these reasons, I would not grant the defendant's motion for summary judgment and would, without deciding the matter, find that the facts of this case are "potentially amenable to liability" for the township. *Bibler*, --- Ohio App.3d ---, 2016-Ohio-8449, --- N.E.3d ---, ¶ 20.

**/jlr**