JUDGES: Hon. Cheryl L. Waite, Hon. Gene Donofrio, Hon. Mary DeGenaro
OPINION
WAITE, J.
*990 {¶ 1} Appellant Maureen A. Emmerling, individually and as the personal representative of the Estate of Robert M. Emmerling ("Emmerling"), appeals the decision of the Mahoning County Common Pleas Court granting summary judgment to Appellee, Mahoning County Board of Commissioners. This matter involves a wrongful death action based on road signs placed under Appellee's authority. Because the signs in questions are not mandatory pursuant to the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), Appellant has not established that any exception to general governmental immunity exists. Moreover, Appellant has failed to establish any proximate causation between the actions of Appellee and the incident in question. Therefore, Appellant's assignment of error is without merit and the judgment of the trial court is affirmed.
{¶ 2} The following facts are derived from the record. On March 21, 2012, Appellant's spouse, Robert M. Emmerling, was operating a motorcycle in the left-hand lane of southbound South Avenue approaching McClurg Road in Boardman, Ohio. At the same time, Alex Tareshawty ("Tareshawty"), operating a minivan, was waiting to turn left onto northbound South Avenue. Traffic on South Avenue did not have any "stop" indicator at the McClurg Road intersection.
{¶ 3} After stopping in the marked lane on McClurg Road preparatory to making his left turn onto South Avenue, Tareshawty slowly moved his vehicle forward in an effort to better see the traffic on South Avenue. Tareshawty looked to the left and to the right multiple times before proceeding to make his left turn onto northbound South Avenue. When Tareshawty entered South Avenue, Emmerling's motorcycle collided with the side of Tareshawty's minivan. From the time he began his left turn until the moment of collision, Tareshawty continued to look only to his left, toward the direction Emmerling was proceeding. When Tareshawty first saw the motorcycle, it was too late to stop so he attempted to speed up.
{¶ 4} Tareshawty testified that the motorcycle "seemed to appear out of nowhere." (Tareshawty Depo., p. 80.) Tareshawty specifically testified as follows:
Q. Was there anything that in your experience before the date of the collision, that obstructed a driver's view to the left, when preparing to make a turn from McClurg onto north bound South Avenue?
A. No.
Q. Did any of the signs or telephone poles in your estimation obstruct a driver's view when turning from McClurg onto north bound South Avenue?
A. No.
(Tareshawty Depo., pp. 46-47.)
{¶ 5} Tareshawty further testified:
Q. Is it correct then that from the time you decided to try to pull out to make your turn until the time of impact, you were looking left towards the direction where the motorcycle was coming from?
A. Yes.
Q. Do you have any idea why you didn't see the motorcycle until the front end of your car was in that center turn lane* * *?
A. No.
* * *
Q. Do you know why you failed to see the motorcycle before it was too late to avoid the collision?
*991 MR. MEOLA: Objection. Asked and answered.
THE WITNESS: I don't know.
(Tareshawty Depo., pp. 87, 89.)
{¶ 6} Emmerling passed away on April 19, 2012. Appellant filed a complaint against Appellee on March 20, 2014, seeking, among other things, damages for the wrongful death of her spouse. Appellant contends that Tareshawty's view of oncoming traffic was obstructed by signs erected by Appellee on the west side of South Avenue that were put in place contrary to the requirements of the OMUTCD, and that this obstruction was a proximate cause of her husband's death.
{¶ 7} The three signs in contention were mounted on the same two posts. At the top was a two-way left turn sign. In the middle was a hospital sign. Below the hospital sign was a directional arrow sign indicating the direction of the hospital.
{¶ 8} In 2010, before the accident in question, Appellee hired DLZ Ohio, Inc., professional engineers, to study the intersection. This site had been an area where other accidents had occurred. The purpose of the study was to identify problems, determine countermeasures, and set up reasonable time periods to implement the proposed countermeasures. In October 2010, Appellee received a report from DLZ. A copy of the report was entered into evidence and an engineer employed by Appellee testified at deposition as to the report:
Q The safety study that the Mahoning County Engineer hired DLZ to perform explained what the most frequent type of crash was at that intersection; right?
A Yeah.
Q What kind of crash was that?
A Left turn crashes.
Q The most-strike that. The safety study the Mahoning County engineer commissioned to have done told Mahoning County well before Robert Emmerling's fatal crash that the most common type of crash was the very type that he had; right?
A Oh, yeah.
(Donham Depo., p. 75.)
{¶ 9} During deposition, Robert Donham II, traffic engineer for the Mahoning County Engineer's Office, stated that from 2005 to 2012, there were 62 crashes at the intersection. The DLZ report recommended that the signs be moved as a short term countermeasure. While Donham instructed that the hospital sign and arrow sign should be moved, he also instructed that no special trip needed to be made to the intersection to carry out this instruction. The signs were not moved until after the Emmerling accident.
{¶ 10} Donham testified further that the bottom of the highest sign, the two-way left turn sign, was supposed to be at least seven feet from the ground. Any signs mounted below this sign could only be set one foot lower than the minimum height, which in this case meant set at six feet. Donham stated that on the date of the accident, the bottom of the hospital sign was five feet from the ground and the bottom of the directional arrow for the hospital was four and one half feet from the ground. Paul W. Dorothy, one of Appellee's expert witnesses, testified at deposition that the bottom of the directional arrow for the hospital was lower, approximately four feet two and one-half inches from the ground.
{¶ 11} Both parties presented the opinions of accident reconstruction experts on the issue of whether or not these signs played any role in the accident. Appellant's expert, Michael Sutton, P.E., gave his opinion that the location of the hospital and accompanying directional arrow signs explain why Tareshawty stated that Emmerling *992 appeared to come out of nowhere. He opined that these signs blocked Tareshawty's view, thus contributing to the accident. Sean A. Doyle, P.E., Appellee's expert, on the other hand opined that the existence and signage location played absolutely no role in the accident.
{¶ 12} On March 16, 2015, Appellee filed a motion for summary judgment arguing that, as a political subdivision, it was immune from tort liability, that there were no exceptions to its immunity, and that Appellant had no evidence to establish a proximate cause between any alleged negligence of Appellee and the accident. Appellant filed a memorandum in opposition, to which Appellee replied. On August 19, 2015, the trial court granted Appellee's motion for summary judgment, concluding that Appellee was immune from any tort liability and Appellant could not establish that a proximate cause existed between the location of the signs and the accident. Appellant filed this timely appeal setting forth a single assignment of error.
ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE BASED UPON AN IMPROPER APPLICATION OF POLITICAL SUBDIVISION IMMUNITY AND BASED UPON IMPROPERLY RESOLVING QUESTIONS OF FACT IN APPELLEE'S FAVOR.
{¶ 13} An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court, set forth in Civ.R. 56(C). Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. Temple v. Wean United, Inc., 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon & Assoc., Inc ., 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).
{¶ 14} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) Dresher v. Burt , 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Id. at 293, 662 N.E.2d 264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. Brewer v. Cleveland Bd. of Edn., 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).
{¶ 15} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable *993 to the nonmoving party. Temple , 50 Ohio St.2d at 327, 364 N.E.2d 267.
{¶ 16} R.C. Chapter 2744, which is referred to as the sovereign immunity statute, provides certain limitations on political subdivisions' liability for injuries and deaths on public grounds. Baker v. Wayne Cty ., 147 Ohio St.3d 51, 2016-Ohio-1566, 60 N.E.3d 1214 ¶ 13, citing Howard v. Miami Twp. Fire Div ., 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, ¶ 26. The availability of immunity is a question of law properly determined by the court prior to trial. Conley v. Shearer , 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992) ; Hall v. Ft. Frye Local School Dist. Bd. of Edn ., 111 Ohio App.3d 690, 694, 676 N.E.2d 1241 (4th Dist.1996).
{¶ 17} The determination of whether or not a political subdivision is immune from tort liability for injuries or death to a person involves a three-tiered analysis. Rastaedt v. Youngstown , 7th Dist. No. 12 MA 0082, 2013-Ohio-750, 2013 WL 793597, 10 ; Colbert v. Cleveland , 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7. The first tier requires a determination of whether the political subdivision is immune from liability because the alleged negligent acts occur in connection with a governmental or proprietary function pursuant to R.C. 2744.02(A). If immunity is found to exist after this first tier review, determination under the second tier requires an examination of whether any of the five exceptions to immunity listed in R.C. 2744.02(B) are involved. Baker at ¶ 11. If one of these exceptions applies, then there must be a third tier examination to see whether any defenses found in R.C. 2744.03 reinstate immunity from suit. Id. at ¶ 11.
{¶ 18} Regarding the first tier, the parties agree that in providing and maintaining public roadways, Appellee is a political subdivision engaged in governmental or proprietary conduct and is entitled to immunity from tort liability under R.C. 2744.02(A). Thus, we turn to the second tier of the analysis.
{¶ 19} Appellant argues that R.C. 2744.02(B)(3) contains an exception to the immunity enjoyed by Appellee. That section provides, in pertinent part, "political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads."
{¶ 20} "Public roads" are defined in R.C. 2744.01(H) :
"Public roads" means public roads, highways, streets, avenues, alleys and bridges within a political subdivision. "Public roads" does not include berms, shoulders, rights-of-way, or traffic control devices unless the traffic control devices are mandated by the Ohio manual of uniform traffic control devices.
{¶ 21} We must accept the definition of "public roads" provided by the general assembly. Baker at ¶ 13. Thus, if the signs in this case are mandated by the OMUTCD, they are included in the duty to keep "public roads" in repair. R.C. 2744.01(H). Yonkings v. Piwinski , 10th Dist. Nos. 11AP-07, 11AP 09, 2011-Ohio-6232, 2011 WL 6036950, ¶ 22-24. Under R.C. 2744.02(B)(3), the "negligent failure" to keep the signs "in repair" would expose Appellee to liability for injury, death, or loss to person caused by its negligence. The trial court, in granting Appellee's motion for summary judgment, concluded that none of the three signs at issue here are mandatory pursuant to the OMUTCD. Therefore, the exception to immunity found in R.C. 2744.02(B)(3) does not apply to expose Appellee to suit. (The proximate cause of this accident was also at issue, and is separately discussed). Although Appellant *994 does not maintain that the two-way left turn directional sign is mandatory, Appellant does assert that the hospital sign and/or its accompanying directional sign are mandated by the OMUTCD. Appellee argues that none of these three signs are mandated, and the trial court properly granted summary judgment on this issue to Appellee.
{¶ 22} The OMUTCD includes text headings to classify and categorize the nature of its accompanying text. In this matter we must refer to the 2005 edition of the manual, because the 2012 edition did not become effective until April 12, 2012, after the date of the incident in question. Part I of the 2005 OMUTCD provides guidance regarding the headings utilized in the manual. The text is grouped under headings entitled "Standard," "Guidance," "Option," and "Support." Information found under the "Standard" classification is considered to be a "required, mandatory, or specifically prohibited practice regarding a traffic control device ." (Emphasis sic.) OMUTCD, p. I-2. This definition notes that the verb "shall" is "typically used" and that the text appears in bold type. Id.
{¶ 23} Text following the "Guidance" heading is a "recommended, but not mandatory, practice in typical situations. " (Emphasis sic.) Id. Deviations are permitted if engineering judgment or engineering study indicate a deviation is appropriate. Id. The "Option" heading allows for practices that carry "no requirement or recommendation. " (Emphasis sic.) Id. "Support" contains statements that do "not convey any degree of mandate, recommendation, authorization, prohibition, or enforceable condition. " (Emphasis sic.) Id.
{¶ 24} Part 2 of the OMUTCD relates to signs. OMUTCD 2TC-1. Chapter 2D is titled "Guide Signs-Conventional Roads." Section 2D.45 is titled "General Service Signs." OMUTCD, p. 2D-27. This section explains:
On conventional roads, commercial services such as gas, food, and lodging generally are within sight and are available to the road user at reasonably frequent intervals along the route. Consequently, on this class of road there usually is no need for special signs calling attention to these services. Moreover, General Service signing is usually not required in urban areas except for hospitals, law enforcement assistance, tourist information centers, and camping.
OMUTCD, p. 2D-27.
{¶ 25} Appellant contends that the hospital sign in question is "mandated" by the section quoted above because of the use of the word "required." Thus, she believes the hospital and/or arrow signs are "mandatory" for our purposes pursuant to the OMUTCD, and the incorrect placement of these signs, alone, amounts to a failure of Appellee to keep the roadway in repair, triggering an exception to immunity. However, this language falls under the general heading of "Support," the lowest classification of signage, which Appellee says reflects that there is no degree of mandate, recommendation, authorization, prohibition, or enforceable condition. Id. Moreover, none of this language is in bold type.
{¶ 26} Appellant attached to its brief in opposition to summary judgment a report from Eric A. Hulme, E.I., a purported engineering expert. In it, Hulme opines that the disputed language "provides a necessity to install the general services sign for hospitals in urban areas." (5/15/15 Opp. to S.J., Exh. N, p. 14). Thus, the question presented is whether the language stating that general service signing "is usually not required in urban areas except for hospitals" makes the hospital sign mandatory in the OMUTCD despite *995 the fact that it clearly falls under the heading of "Support" and is not printed in bold type. Both parties cite Webb v. Edwards , 165 Ohio App.3d 158, 2005-Ohio-6379, 845 N.E.2d 530, ¶ 23 (4th Dist.) for guidance as to their respective positions:
The OMUTCD contains mandatory, advisory and permissive conditions, differentiated by the use of the terms "shall," "should" and "may." Standards include the word "shall" and are considered mandatory. Advisory conditions including the word "should" are considered to be advisable usage, but are not mandatory. Permissive conditions include the word "may" and carry no requirement or recommendation.
{¶ 27} Appellant contends "required" and "shall" express the same meaning. Appellant notes that the expert hired by Appellee agreed that once the hospital sign was erected, the arrow sign became "mandatory." Appellee responds that although a directional message (arrow sign) was required once the hospital sign was erected, the specific directional arrow sign used here was not mandated. While still disagreeing with Appellant's contention that the hospital sign was mandatory, Appellee contends that even if it was, the arrow sign remained discretionary in nature.
{¶ 28} In granting summary judgment, the trial court employed the same rationale as to the arrow sign. Noting that once the hospital sign was erected, the OMUTCD directed additional signage was needed, the court concluded:
Although the word "shall" is used in this section, the standard only applies after the discretionary decision has been made to install a general service sign, and does not require that a specific sign be placed at that location, only that a "directional message" accompany the sign. As such the directional sign at the intersection of McClurg Road and South Avenue, in Boardman Township is not mandatory under the Ohio Manual of Uniform Traffic Control Devices.
(8/19/15 J.E., p. 6).
{¶ 29} Appellant cites Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp ., 49 Ohio App.3d 129, 551 N.E.2d 215 (10th Dist.1988) in support of its argument that once the hospital sign was erected, the arrow sign became mandatory. In Lumbermens , "rough road" signs and a "bump" sign were posted. Appellant insurance company argued that the signs were mandatory, because these signs were to be accompanied by advisory speed signs and in the OMUTCD the word "shall" was used. The court concluded that in Section 2N-29 OMUTCD, language discussing both speed signs and "bump" signs contained similar "shall" requirements. Section 1 D(1) states that the word "shall" represents a mandatory condition, one that must be met when a particular traffic device is installed. Although it may be an exercise of engineering judgment whether conditions are such that "rough road" or "bump" signs should be installed, the OMUTCD nonetheless mandates that these signs, once installed, "shall" be accompanied by advisory speed signs. ld. at 131, 551 N.E.2d 215.
{¶ 30} We note, as does Appellee, that the Lumbermens court was never asked to review this issue as it regards sovereign immunity pursuant to Chapter 2744 of the Revised Code.
{¶ 31} The Third District Court of Appeals recently did address the issue of mandatory signs under the OMUTCD in Deitz v. Harshbarger, 2017-Ohio-2917, 89 N.E.3d 1271. In Deitz a representative of the estate of a motorist killed in an automobile accident brought suit against a township board of trustees alleging that the failure to remove foliage obstructing a stop sign and the failure to place a "stop *996 ahead" sign at a sufficient distance from the stop sign caused the motorist's death, and that this failure triggered an exception to the immunity of the political subdivision. The Third District held that the stop sign was not mandatory, hence the failure to place a "stop ahead" sign did not fit within the definition of the requirement to keep the "public roads "in repair" in order to trigger the exception to political subdivision immunity found in R.C. 2744.02(B)(3). The court determined that the general assembly, in amending R.C. 2744 in 2003, added the definition of "public roads" but removed the "nuisance" language previously found in R.C. 2744.02(B)(3), replacing it with "obstruction." Prior to 2003, this section read:
(3) Political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivisions open, in repair, and free from nuisance, except that it is a full defense to such liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.
{¶ 32} After 2003, this section now states:
(3) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.
Thus, the general assembly did not intend all erected traffic control devices to be considered part of a public road. Id. at ¶29. The court ultimately held that, as the stop sign was not mandated by the OMUTCD and the political subdivision decided to erect this sign discretionarily, the sign was not "mandatory" for purposes of determining whether an exception to immunity was triggered. Id. at ¶26.
{¶ 33} The statute does not clearly outline what is meant by the requirement to keep roadways "in repair." Leslie v. Cleveland, 2015-Ohio-1833, 37 N.E.3d 745, ¶ 14. Courts have looked to the Supreme Court of Ohio's interpretation of a former version of R.C. 305.12, which authorized suits against a board of county commissioners for failure to keep roads "in proper repair." Heckert v. Patrick, 15 Ohio St.3d 402, 406, 473 N.E.2d 1204 (1984). In interpreting the earlier statute, the Supreme Court concluded: "the intent of the General Assembly was to place a duty on the commissioners only in matters concerning either the deterioration or disassembly of county roads and bridges." Id. at 406, 473 N.E.2d 1204. Thus, "in repair" has been interpreted as "maintaining a road's condition after construction or reconstruction, for instance by fixing holes and crumbling pavement. It deals with repairs after deterioration of a road or disassembly of a bridge, for instance." Bonace v. Springfield Twp., 179 Ohio App.3d 736, 2008-Ohio-6364, 903 N.E.2d 683, ¶ 29. The phrase has not been held broad enough to encompass the design or construction of roadways and, as such, we cannot conclude that the erection of the hospital or arrow signs in question fall within the meaning of keeping this roadway "in repair". Neither of these signs falls within the highest category of the OMUTCD; the "Standard" classification. Despite the manual's use of the word "required" when discussing hospital *997 signage in the lowest, or "Support" classification, none of this language is found in bold face. Hence, the hospital and arrow sign placement was discretionary with Appellee. There is no genuine issue of material fact that the signs were deteriorated or disassembled. Appellant contends that the signs should have been placed in a different position, but this involves use of discretion and an issue of roadway design or construction. The phrase "in repair" does not create a duty to change the position of the signs at issue. The trial court correctly determined that no exception to Appellee's immunity exists, here. We must note that even if we were to hold that the sign placements were included within the duty to keep roadways "in repair" and found that Appellee's action in placing these signs created an exception to immunity, immunity would be restored by the defense of Appellee's use of discretion as codified in R.C. 2744.03(A)(3) and (5).
{¶ 34} R.C. 2744.03(A) provides:
(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
* * *
(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.
* * *
(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.
{¶ 35} The Supreme Court of Ohio distinguished between R.C. 2744.03(A)(3) and (5) noting:
Although both R.C. 2744.03(A)(5) and 2744.03(A)(3) concern an employee's discretionary acts, the focus of subsection (A)(3) is that the employee be engaged in policy-making, planning, or enforcement. Also unlike R.C. 2744.03(A)(5), R.C. 2744.03(A)(3) does not have language limiting its grant of immunity. In other words, a political subdivision may assert the immunity defense when an employee who has the duty and responsibility for policy-making, planning or enforcement by virtue of office or position actually exercises discretion with respect to that power. This immunity exists even if the discretionary actions were done recklessly or with bad faith or malice.
Elston v. Howland Local Schools, 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 27.
{¶ 36} The Supreme Court applied the discretionary defenses found in R.C. 2744.03(A)(3) and (5) to conclude that they precluded the imposition of liability on a political subdivision for acts or omissions related to a defect in sign construction or the failure to install signage. Franks v. Lopez, 69 Ohio St.3d 345, 347-350, 632 N.E.2d 502 (1994).
{¶ 37} Appellant contends, here, that Appellee had no discretion with regard to erecting the signs. Appellant cites to *998 Miller v. State , 10th Dist. No. 13AP-849, 2014-Ohio-3738, 2014 WL 4245913 where the court affirmed the trial court's conclusion that the Ohio Department of Transportation ("ODOT") was not entitled to political subdivision immunity pursuant to R.C. 2744.03(A)(5) because ODOT "did not demonstrate its failure to repair the potholes at issue involved the exercise of an executive or planning function involving the making of a basic policy decision characterized by the exercise of a high degree of official judgment or discretion." Miller at ¶ 35. Appellant urges that the removal or correction of the height of the hospital and arrow signs are directly analogous to the failure to fill a pothole. Appellant argues that once Appellee knew the height of the signage was contrary to the directives of the OMUTCD, Appellee's decisions about how to correct the problem did not involve the type of judgment or discretion intended by R.C. 2744.03(A)(5), as per Miller . The manner in which Appellee chose to correct the height problem was not arrived at by an executive or planning function and did not require a basic policy decision. Id. Appellant also posits that even if the height requirements were discretionary, Appellee had a duty to correct the situation within a reasonable time.
{¶ 38} Appellee, however, points out that the DLZ study concluded merely that Appellee should "consider" relocating the signs because they may "potentially" block the sight of eastbound drivers looking north. Because moving the signs was "merely a suggestion," and the decision to relocate the signs did involve a discretionary decision, this supports finding Appellee immune from suit under R.C. 2744.03(A)(5). (Appellee's Brf., p. 19.) Appellee is correct, here. The very evidence on which Appellant relies, the DLZ study, leads to the conclusion that moving the signs was discretionary with Appellee. Further, neither the study nor the statute impose "reasonable time" limitations on Appellee.
{¶ 39} Lastly, Appellant complains the trial court erred because it resolved disputed questions of fact in favor of Appellee with regard to the issue of causation. The trial court also granted summary judgment to Appellee because the court held that Appellant "cannot establish probable cause in this action." (8/19/15 J.E., p. 8.) Citing Littleton v. Good Samaritan Hospital & Health Center , 39 Ohio St.3d 86, 92, 529 N.E.2d 449 (1988), the trial court noted that to prove negligence in a death claim, a party must establish a duty, breach of that duty, and proximate cause between the breach and the death. The trial court concluded, citing Abbuhl v. Orange Village , 8th Dist. No. 82203, 2003-Ohio-4662, 2003 WL 22053455, ¶ 25, that the accident reconstruction expert's opinion offered by Appellant was speculative and contained mere conjecture, because Sutton never visited the site and did not "have specific information regarding where Mr. Tareshawty was located in the roadway prior to the accident." (8/19/15 J.E., p. 9.) Abbuhl involved a case where the alleged negligence was the failure to install adequate lighting in a parking lot. The record showed the accident was caused by a tortfeasor who was speeding and looking the other way. In Abbuhl , the court concluded that summary judgment was appropriate even if there was negligence with regard to the installation of the lighting, because the lighting was not a proximate cause of the accident. Here, the trial court emphasized that "Tareshawty indicated no signs or poles obstructed his view, and that he just did not see Mr. Emmerling's motorcycle."ld. at 9. The trial court concluded that any testimony contrary to Tareshawty's direct statement was mere speculation. Tareshawty was the only eyewitness to the accident.
*999 {¶ 40} Appellant complains that the trial court improperly weighed the evidence and emphasized portions of the evidence, thereby usurping the role of the jury. Appellant argues that the trial court premised its decision entirely on Tareshawty's testimony that the signs did not block his view. In so doing, Appellant complains that the court ignored Tareshawty's testimony that although he repeatedly looked left before his turn, he did not see the approaching motorcycle; that from the time he began his turn until the collision he was looking in the direction of the oncoming motorcycle and, despite this, the motorcycle seemed to appear out of nowhere. Tareshawty was unable to explain why he did not see the motorcycle.
{¶ 41} Appellant posits that her accident reconstruction expert, Sutton, based his opinion on Tareshawty's testimony. It was Sutton's opinion the hospital sign and the directional arrow sign blocked Tareshawty's view during the most critical few seconds when Tareshawty was making the decision to enter the intersection. Sutton testified that if you accept Tareshawty's testimony, when he crept up to the intersection he was put into an area where the sign would block a view of the victim's motorcycle. Sutton concluded that the most logical explanation is that the motorcycle was not in view because the sign blocked it. Sutton relies heavily on the fact that at the time of the accident, Tareshawty was only sixteen years old. Appellant also complains that the trial court, in concluding that there was no genuine issue of material fact, failed to consider the DLZ report and recommendation. The recommendation to correct the height of the signs was made more than one year before the accident and Donham gave instructions more than one year before the accident that the height of the signs should be corrected. Appellant argues that this combination of facts create a genuine issue of material fact whether the signs were a proximate cause of the accident and ultimate death of Emmerling. Appellant emphasizes that Tareshawty's testimony is but the testimony of one witness. Appellant urges that the jury should be allowed to weigh his testimony along with all of the foregoing facts.
{¶ 42} In response, Appellee contends that the trial court was correct in its determination that Sutton's opinion is mere speculation and conjecture. Appellee cites Allen v. USA Parking Sys., Inc. , 7th Dist. No. 10 MA 0175, 2011-Ohio-6642, 2011 WL 6793694, ¶ 46, as support for this position. Allen concerned a plaintiff's alternative theory that loose concrete had contributed to the plaintiff's fall. The plaintiff could not see the pavement below the layer of ice and snow that covered the area in which he fell, but saw loose concrete in some other area of the parking lot. We concluded that plaintiff's belief that there "must be" loose concrete in the area he actually fell was mere speculation on the part of the plaintiff. As such, it could not serve to raise a genuine issue of material fact. Appellee also relies on our decision in Allstate Ins. Co. v. Sears , 7th Dist. No. 06 BE 0010, 2007-Ohio-4977, 2007 WL 2758700, ¶ 74, where we noted that Allstate failed to present any evidence, despite an opportunity to submit additional evidence, that Sears breached a duty or that some act or failure to act on the part of Sears caused the fire in question.
{¶ 43} Appellee is correct that Appellant's expert relies on mere conjecture. Appellant's witness, Tareshawty, directly stated under oath that his view was not obstructed and that he had no idea why he did not see the decedent and his motorcycle. While Appellant's expert speculates that this must be due to the signage blocking Tareshawty's view, the direct and unwavering testimony of the eyewitness directly *1000 contradicts this theory. This is not a case where there is no witness testimony on an issue, or the witness' memory is somehow impaired giving rise to the use of an expert to reconstruct events. This witness, the tortfeasor, stated under oath that he was constantly looking in the direction of the deceased and that no "signs or telephone poles" obstructed his view of South Avenue as he attempted to turn onto that street. Tareshawty did not equivocate. Hence, the expert's opinion that these signs could obstruct the view of any other driver is meaningless in this case where the driver states that the facts are otherwise. As to Tareshawty's youth or the length of time that passed between the decision of Appellee's employee to move the signs and the actual date they were moved, these facts are also immaterial to this case. The driver's view was not obstructed. He simply failed to see the motorcyclist until it was too late.
{¶ 44} "[T]he proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred." Aiken v. Indus. Comm., 143 Ohio St. 113, 117, 53 N.E.2d 1018 (1944). The driver unequivocally states the signs played no role in this accident. Appellant's expert issued an affidavit stating that his logical deduction was that placement of the signs caused this accident. In so doing, that expert analyzed only a drawing of the incident. While he testified that with a reasonable degree of engineering certainty the signs must have played a role in obstructing Tareshawty's view, this was directly contradicted by the only person who could testify with absolute certainty as to the facts. Sutton's testimony cannot serve to create a conflict of fact where none exists. Appellee's expert, who actually went to the site of the accident and utilized the same calculations as Appellant's expert, concluded that the driver's view would not be obstructed by the signs. If this matter involved only the two expert opinions, genuine issues of fact would be raised by these opinions. These opinions are immaterial, however, given the concise testimony of Tareshawty.
{¶ 45} Based on the foregoing, Appellee is immune from suit. The parties admit that, unless an exception to immunity can be found, blanket immunity exists. The signs in question are not subject to mandatory requirements of the OMUTCD, and hence the manner and mode of placement were discretionary acts by Appellee and do not run afoul of their duty to keep the public roadways in repair. Even if the signs were considered mandatory, Appellant has not established a causal connection between the driver's conduct and any actionable conduct by Appellee. Appellant's expert witness provides mere conjecture, here, which cannot create a material dispute in fact. The trial court did not err in granting summary judgment to Appellee. Appellant's assignment of error is without merit and the judgment of the trial court is affirmed.
Donofrio, J., dissents; see dissenting opinion.
DeGenaro, J., concurs.