[Cite as *Davis v. Brown Local Schools*, 2019-Ohio-246.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

KELLI D. DAVIS, ADMINISTRATOR,

Plaintiff-Appellee,

v.

BROWN LOCAL SCHOOL DISTRICT, et al.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 CO 0026**

---

Civil Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2016 CV 142

**BEFORE:**
Kathleen Bartlett, Gene Donofrio, Cheryl Waite, Judges.

---

**JUDGMENT:**
REVERSED; SUMMARY JUDGMENT GRANTED TO APPELLANTS BROWN LOCAL
SCHOOL DISTRICT AND TANYA S. MCLAUGHLIN

---

*Attys. Dale Cook, Mark Landes, and Brandon Abshier*, Two Mironova Place, Suite 700, Columbus, Ohio 43215, for Appellants and

*Atty. Stephen Griffin*, 4051 Whipple Avenue NW, Suite 201, Canton, Ohio 44718 and *Atty. Michael Kahlenberg*, 825 South Main Street, North Canton, Ohio 44720, for Appellee.

Dated:  January 24, 2019

---

**Bartlett, J.**

{¶1}   Appellants Brown School District and Tanya S. McLaughlin appeal the judgment entry of the Columbiana County Court of Common Pleas denying their motion for summary judgment on the basis of political-subdivision immunity.   The First Amended Complaint, filed by Appellee Kelli Davis, Administrator of the Estate of Storm Angione, Deceased,   states seven causes of action, including wrongful death, survivorship, and loss of chance, as well as punitive damages claims, against the school district; Deborah Dustman, a bus driver employed by the school district; Columbiana County; McLaughlin, a dispatcher employed by Columbiana County; the Columbiana County Sheriff's Office; Columbiana County Sheriff Raymond L. Stone; and the Columbiana County Commissioners.  The Commissioners and the survivorship and punitive damages claims were voluntarily dismissed prior to the summary judgment entry.

{¶2}   Appellee contends that Dustman breached her duty of care to other motorists when she failed to reduce the speed of the bus she was driving below the posted limit due to inclement weather. Angione was a passenger in an automobile traveling westbound on a two-lane highway that lost control, slid completely into Dustman's eastbound lane of traffic, and collided with her school bus.  Finding no evidence in the record of wanton or reckless conduct, the trial court entered summary judgment in favor of Dustman on the employee claim against her, but denied summary judgment to the school district on the wrongful death claim based on her alleged negligence.

{¶3}   Appellee further contends that McLaughlin's failure to dispatch emergency services immediately upon receiving the 9-1-1 call constituted willful and/or reckless conduct.  The trial court granted summary judgment in favor of the Sheriff and the County based on McLaughlin's delayed action, but denied summary judgment on the employee claim against McLaughlin.  Despite the dismissal of the claim against the County, the trial court recognized the County's continuing obligation to defend

Case No. 17 CO 0026

McLaughlin.

**{¶4}** Because Dustman owed no duty of care to Angione, and the evidence of proximate cause is insufficient as a matter of law, we find that the school board is immune from suit. Further, because there is no evidence that McLaughlin failed to act in the face of a great probability of harm, or consciously disregarded a known and obvious risk, we find that she is likewise immune from suit.

I.   Facts

**{¶5}** On the morning of November 22, 2014, Dustman was scheduled to transport the Malvern High School varsity and junior varsity basketball teams to a scrimmage in Lisbon, Ohio. (Dustman Depo. 21). Dustman was unaware that a freezing rain advisory issued by the National Weather Service in Pittsburgh was in effect for Columbiana County from 5:00 a.m. until noon that day. The notification read, "A freezing rain advisory means that freezing rain will cause travel difficulties. Be prepared for icy surfaces and use caution while driving." (Expert Report of Mark Taylor 1).

**{¶6}** Dustman explained that she does not routinely consult the weather forecast unless it is snowing prior to a bus trip. (Dustman Depo. 36-37). She had previously refused to drive the bus on two occasions due to inclement weather. In the first instance, she encountered black ice, so she pulled the bus to the side of the road and waited until the road department applied rock salt to the surface. The second instance involved heavy snowfall. (*Id.* 38-39).

**{¶7}** Dustman drove her automobile to the bus garage, which is approximately a mile and a half from her home. She noticed no signs of ice on the road. (Dustman Aff. ¶ 2.) Dustman conducted a pre-trip check of the bus and then departed on the roughly one-half mile commute to Malvern High School. She observed no signs of ice on the road. (*Id.* ¶ 3-5). When Dustman arrived at the school, she waited for the team to board the bus. While she was waiting, she observed no signs of ice on the road or on the bus. (*Id.* ¶ 6).

**{¶8}** That same morning, Dennis Tucci, coach of the Malvern High School varsity basketball team, drove from his home to Malvern High School, a distance of approximately one mile. (Tucci Aff. ¶ 1, 4). He did not observe any ice on the road, freezing rain, or sleet during his commute. (*Id.*) While at the school and prior to

boarding the bus, Tucci did not observe any ice or sleet on the roads or on the school bus. (*Id.* ¶ 5).

**{¶9}** The bus departed for Lisbon, Ohio through Minerva, Ohio and then east on U.S. Route 30. Dustman made five stops between Malvern High School and the accident. She had no difficulty stopping. (Dustman Depo. 60-61). She never observed any ice on the road. (*Id.* 73.)

**{¶10}** Tucci was seated in the first row on the passenger side of the school bus. (Tucci Aff. ¶ 2). Ted Majestic, coach of the junior varsity basketball team, was seated in the first row behind Dustman. (Ted Majestic Aff. ¶ 1-2). Tucci observed a light rain begin to fall while riding on the school bus, but he did not see any freezing rain or ice on the road or the bus during the entire ride. (Tucci Aff. ¶ 6-7). Majestic also recalled a light rain starting to fall as the bus traveled through Minerva, but did not observe any freezing rain or ice on the road during the entire ride. (Majestic Aff. ¶ 3-4). Dustman conceded that she activated her windshield wipers about that time on the lowest setting. (Dustman Depo. 37).

**{¶11}** That same morning, Jon Winkler was traveling for work from his home in West Salem, Ohio. His route took him through Minerva then eastbound on U.S. Route 30. (John Winkler Aff. ¶ 1). Winkler recalled a light mist in the air as he travelled through Minerva. However, in the roughly one-and-one-quarter hours he travelled before the accident, he never observed any signs of ice on the road and never felt his service truck lose traction. (*Id.* at ¶ 3-4). Winkler began following the school bus as it travelled approximately 50 m.p.h. eastbound on U.S. Route 30 after passing through Minerva. (Id. at ¶ 5-6).

**{¶12}** U.S. Route 30 is flanked by a guardrail on its south side and an embankment on its north side at the crash site. (*Id.* ¶ 17). As Dustman was traveling eastbound on U.S. Route 30, she observed the Ford Taurus being driven by Savannah Russell traveling westbound. (Dustman Aff. ¶ 11.) Angione was in the front passenger seat and A'Liyia Hancock was in the back seat. The school bus was traveling approximately 50 m.p.h. (*Id.* ¶ 10). The posted speed limit was 55 m.p.h. (Dustman Depo. 49).

**{¶13}** The Ford Taurus lost control and began to rotate counter-clockwise as it

Case No. 17 CO 0026

traveled across the centerline of the road. (Dustman Aff. ¶ 12).  With the Ford Taurus turned sideways and approaching the bus down the centerline of the road, (Dustman Aff. ¶ 13; Majestic Aff. ¶ 5; Tucci Aff. ¶ 8), Dustman braked but had no means of avoidance due to the guardrail to her right and the Ford Taurus directly in her path. (Dustman Depo. 72; Dustman Aff. ¶ 13).  The passenger side of the Ford Taurus collided with the bus.  (Christopher T. Jester Depo 26.)  The impact occurred while both vehicles were completely in Dustman's lane of traffic. (*Id.* 27-28).

{¶14} When the school bus's brake lights activated, Winkler saw the Ford Taurus sliding sideways into the eastbound lane of traffic and then saw the two vehicles collide.  (Winkler Aff.  ¶ 8).  After colliding with the bus, the Ford Taurus struck the guardrail along the south side of U.S. Route 30 several times and came to a stop in the eastbound lane. (*Id.* ¶ 10).  Winkler applied his brakes with great force in order to avoid hitting the Ford Taurus.  He had no problems slowing his vehicle and noticed no signs of his vehicle sliding while trying to stop. (*Id.* ¶ 11).

{¶15} Winkler immediately parked his service truck on a side road and approached the Ford Taurus on foot. (*Id.* ¶ 12-14).  He observed no signs of life from any of the occupants.  They were motionless, not breathing, and their eyes were open. Winkler did not hear any sounds of distress. (*Id.* ¶ 15).

{¶16} After the collision, Majestic's first concern was the possibility that one or more of the students under his supervision had sustained injuries.  (Majestic Aff. ¶ 9). Within two to three minutes after the collision, after Majestic confirmed that no one on the bus was injured, he walked back to the Ford Taurus. (*Id.* ¶ 10).  Majestic noticed no ice on the road. (*Id.* ¶ 11). When he reached the Ford Taurus, he attempted to communicate with the occupants, but did not receive any response.  He saw no movement, breathing, or any signs of life. (*Id.* ¶ 12-14.)

{¶17} Tucci called the Sheriff's Department direct line to report the accident, then exited the bus and walked back to the Ford Taurus. (Tucci Aff. ¶ 10-11).  He asked the occupants of the Ford Taurus if anyone was okay and whether they could hear his voice, but received no response. Tucci observed no movement or any signs of life. (*Id.* ¶ 12-14).

{¶18} Dustman testified that the road became slick roughly ten or fifteen minutes

after the accident. (Dustman Depo. ¶ 58-59). She explained that the roads began icing over between the accident and the arrival of the Ohio State Highway Patrol ("OSHP"). (*Id.*) Based on the weather and road conditions, Tucci opined that Dustman was driving at a reasonable and safe speed and could not have avoided the collision. (Tucci Aff. ¶ 15-16). Majestic offered the same conclusion. (Majestic Aff. ¶ 8).

**{¶19}** Winkler also opined that Dustman was driving at a safe speed prior to the accident. (Winkler Aff. ¶ 16). The school bus was traveling at the same rate of speed as Winkler's vehicle and he was able to apply his brakes and stop his vehicle short of striking the Ford Taurus that came to rest in his lane. (*Id.*) According to Winkler, who had a view of the entire scene, Dustman was incapable of avoiding the collision. (*Id.* at ¶ 17).

**{¶20}** Eric Derrington, a trooper with OSHP was the first official responder to the scene. When he was dispatched, Trooper Derrington was at the intersection of U.S. Route 30 and Applegate Road, three miles east-southeast of Lisbon. (Derrington Depo. 13). He testified that his cruiser began to fish-tail and he noticed that the truck in front of him was struggling to maintain control due to ice immediately after receiving the radio call. (*Id.*) However, Trooper Derrington was roughly nineteen miles east of the accident scene. The weather system that deposited ice throughout northeast Ohio that day was moving west to east. (*Id.*)

**{¶21}** Trooper Derrington arrived at the scene of the accident at 9:29 a.m., approximately twenty-three minutes after the collision. He explained at his deposition that when he inspected the Ford Taurus, the occupants were not breathing nor exhibiting any signs of life. Trooper Derrington reported to OSHP dispatch that there were three fatalities. (*Id.* 17-18).

**{¶22}** Trooper Derrington was responsible for preparing the Traffic Crash Report and was the lead investigator for the accident. (*Id.* 11). He concluded that Russell was the party at fault. (*Id.* 30-31). As a part of his investigation, Trooper Derrington specifically found that road conditions were wet and icy. (*Id.* 71-72). However, Dustman was not cited for any traffic violation.

**{¶23}** Because there was loss of life, OSHP crash reconstructionist Christopher Jester was called to the scene. (Jester Depo. 8, 12). Based upon his investigation of

the accident, Trooper Jester concluded that the impact occurred completely in Dustman's lane of traffic. (*Id.* 27-28). Like Trooper Derrington, Trooper Jester opined that Russell was the cause of the accident. (*Id.* 30).

{¶24} When Tucci called the Sheriff's Office direct line shortly after the accdient, he was connected to McLaughlin at the Columbiana County Sheriff's Office Dispatch Center. (Raymond L. Stone Aff. ¶ 2.) Tucci explained that there was an accident involving a school bus on U.S. Route 30, past Minerva, on the way to Kensington, Ohio. Tucci advised McLaughlin that he believed there was a fatality. (Tanya McLaughlin Depo. 39).

{¶25} The Sheriff does not respond to accidents on state routes as they are the responsibility of OSHP. (McLaughlin Depo. 34-35). McLaughlin transferred the call to OSHP dispatch, and she believed that OSHP then assumed responsibility for the call and accident. (*Id.* 38.) Trooper Derrington confirmed at his deposition that OSHP was the agency with jurisdiction over this accident, (Derrington Depo. 11), and was responsible for responding to the accident. (*Id.* 87).

{¶26} After McLaughlin ended the call, "Sandy" from OSHP called McLaughlin. Sandy asked McLaughlin to recount the details provided by Tucci. McLaughlin informed Sandy that the accident was on U.S. Route 30, "this side of Minerva," and that the caller believed it was in Columbiana County. McLaughlin also informed Sandy that a school bus hit a car and the caller believed there was a fatality. The audio recordings reveal that Sandy stated that she was going to "mak[e] an incident" for the subject accident. (McLaughlin Aff. ¶ 9).

{¶27} At 9:38 a.m., roughly ten minutes after Trooper Derrington arrived at the scene, OSHP called McLaughlin a second time to request that she dispatch fire and/or EMS to the accident site. OSHP does not have the capability of dispatching or "toning out" first responders. (Derrington Depo. 90). McLaughlin toned out the Hanover Fire Department. (McLaughlin Aff. ¶ 10; McLaughlin Depo. 53). Sandy Creek Fire Department was dispatched at 9:39 a.m. and arrived at the scene on 9:51 a.m. (Aaron Stoller Aff. ¶ 2).

{¶28} McLaughlin's failure to immediately tone out first responders did not violate the policy of the governing board for 9-1-1 in Columbiana County, Ohio.

Case No. 17 CO 0026

(McLaughlin Aff. ¶ 5). The 9-1-1 policy is set forth in the Enhanced 9-1-1 System Standard Operating Procedures Manual ("9-1-1 Manual"). If a dispatcher receives a police, fire, or EMS call over 9-1-1 lines involving an incident in jurisdictions serviced by another agency, he or she is to advise the caller to stay on the line, initiate the transfer to the other agency, and stay on the line with the caller until voice contact is made between the receiving agency and caller. (*Id.* ¶ 10, 9-1-1 Manual attached as Ex. A to Stone Aff.).

**{¶29}** However, in December of 2011, Sheriff Stone instructed dispatchers to take an additional step beyond the requirements in the 9-1-1 Manual.  His December 22, 2011 internal memo, which was posted on a bulletin board in the Sheriff's Office, reads, in pertinent part, "We recently advise [sic] dispatch to transfers [sic] all calls to the appropriate agency per the operations manual.  Until further notice we are suspending this and going back to the procedure of sending the necessary Fire/EMS/Police to the call when applicable."  (*Id.* at ¶ 12, Memo attached as Ex. B to the Stone Aff.)

**{¶30}**  Although McLaughlin adhered to the policy stated in the 9-1-1 Manual, she was reprimanded for failing to follow the internal Sheriff's Office policy as it relates to dispatching emergency personnel regardless of jurisdiction. (*Id.*  ¶ 17-18).   On December 4, 2014, McLaughlin received a written reprimand for neglect in the performance of required duties pursuant to the County Personnel Policy Manual. (McLaughlin Depo. 77).  McLaughlin was cited for a Level III Group 2 offense, described as "wanton and willful neglect in the performance of required duties."  (Policy Manual at 5, attached to McLaughlin Depo.).

II.    Expert testimony

**{¶31}** Appellee offered the expert testimony of accident reconstructionist Henry P. Lipian, and anatomical and emergency department physician Ronald R. Rusnak, Jr., M.D. to establish that: (1) Dustman should have canceled or postponed the bus trip, or, in the alternative, reduced the speed of the bus, based upon prevailing weather conditions; and (2) Angione was still alive after the collision and could have survived his injuries if emergency services were dispatched immediately after Tucci's call to the Sheriff's Office.

{¶32} Pursuant to the admonition in *Argabrite v. Neer,* 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.2d 161, we do not consider Rusnak's testimony at this juncture as McLaughlin's "entitlement to statutory immunity is a separate question from the plaintiff's ability to establish the elements of his or her claim." *Argabrite* ¶ 10. Because Rusnak's testimony relates solely to the argument that McLaughlin's delayed action was a proximate cause of Angione's death, we do not consider it in this interlocutory appeal.

{¶33} Evid.R. 702 sets forth the standard for determining the admissibility of expert testimony. *State v. Jones*, 90 Ohio St.3d 403, 416, 739 N.E.2d 300 (2000). Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." An expert opinion is competent if it is held to a reasonable degree of scientific or medical certainty. *State v. Jackson*, 92 Ohio St.3d 436, 2001-Ohio-1266, 751 N.E.2d 946 citing *State v. Benner*, 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714 (1988). The phrase "reasonable certainty" is synonymous with the term "probability." *Id.*

{¶34} The admissibility of expert testimony on the issue of proximate cause is likewise contingent on the expression of an opinion with respect to the causative event in terms of probability. *Stinson v. England*, 69 Ohio St.3d 451, 455, 633 N.E.2d 532 (1994). "[A]n event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue." *Id.*

{¶35} According to Lipian, the Ford Taurus had proper tire tread depth, but Russell lost control of the vehicle while rounding a gradual curve on U.S. Route 30. (1/13/17 Ex. Rep. 6). There were no pre-impact marks left by the Ford Taurus. (Lipian Depo. 45-46). Because Lipian believed that the Ford Taurus went left of center at a relatively low speed and there was no pre-impact marks, he opined that the vehicle must have lost traction due to ice on the road. (*Id.* 30-31, 1/13/17 Ex. Rep. 6).

According to Lipian, the bus was moving 55 m.p.h. and the Ford Taurus, which was rotating counter-clockwise, was moving 11 m.p.h. at impact. Although Lipian conceded that he would need "a lot more data" to calculate the speed of the Ford Taurus prior to Russell's loss of control, he nonetheless "[thought the Ford Taurus was traveling] well below 55 miles an hour" based on its speed at impact. (*Id.* 45). At his deposition, Lipian conceded that Russell was at fault for the accident, and, further, that

driver error may also have been a probable explanation for her loss of control. (*Id.* 72).

**{¶36}** Nonetheless, Lipian concluded in his report that Dustman should have cancelled or postponed the trip due to the freezing rain advisory. He further concluded that Dustman was driving too fast based upon her training as a commercial truck driver.

**{¶37}** Lipian writes, "[i]f the bus were traveling at a lower, more reasonable rate of speed for conditions, in the range of 35-40 m.p.h., much less energy would have been brought to the crash." (1/13/17 Ex. Rep. 14). However, Lipian did not opine that the accident could have been avoided or that Angione would not have sustained fatal injuries if Dustman had been traveling at a reduced speed. He conceded that he did not conduct a biomechanical analysis of the accident. (Lipian Depo. 49-50).

**{¶38}** Appellant countered Lipian's report with the expert report of meteorologist Mark Taylor. Taylor explained that the amount of ice and the time it began to accumulate in Minerva is unknown, except to the extent that it can be extrapolated from local observations. His expert report reads, in pertinent part, "All [National Weather Service] locations [Youngstown, North Canton, Pittsburgh] on that day had no precipitation and very dry conditions, followed by mist/drizzle where very light to a trace amount of ice could form because it was below freezing at the time of the mist/drizzle, followed by steadier light rain that could develop ice more rapidly as it was still below freezing, followed by a maximum extent of ice close to the time when temperatures at each location went above freezing and ice would begin to melt." (Taylor Ex. Rep. (undated) ¶ 7). Taylor observed that light rain began to fall in North Canton (20 miles southwest of Minerva) at 7:43 a.m. and stopped at 8:51a.m., (*Id.* ¶ 5), roughly 15 minutes before the accident.

  III. <u>Law</u>

**{¶39}** An appellate court reviews a trial court's summary judgment decision de novo. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 5. A motion is properly granted if the court, viewing the evidence in a light most favorable to the party against whom the motion is made, determines that: (1) there are no genuine issues as to any material facts; (2) the movant is entitled to judgment as a matter of law; and (3) the evidence is such that reasonable minds can come to but one conclusion, which is adverse to the opposing party. Civ.R. 56(C); *Byrd*

*v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10.

**{¶40}** An order denying a motion for summary judgment is generally not a final, appealable order. *State ex rel. Overmeyer v. Walinski*, 8 Ohio St.2d 23, 222 N.E.2d 312 (1966). However, R.C. 2744.02(C) provides "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." Thus, R.C. 2744.02(C) grants appellate courts jurisdiction to review the denial of a motion for summary judgment based upon immunity. *Nicholson v. LoanMax, LLC*, 7th Dist. No. 16 BE 0057, 2018-Ohio-375, ¶ 7.

**{¶41}** The Political Subdivision Tort Liability Act is codified in R.C. Chapter 2744 and was enacted in response to the judicial abolishment of the common-law doctrine of sovereign immunity for municipal corporations in *Haverlack v. Portage Homes, Inc.*, 2 Ohio St.3d 26, 442 N.E.2d 749 (1982) and *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.*, 6 Ohio St.3d 31, 451 N.E.2d 228 (1983). See *Franks v. Lopez*, 69 Ohio St.3d 345, 347, 632 N.E.2d 502 (1994). The Act establishes statutory tort immunity in specific cases in which political subdivisions, including cities and townships, may otherwise be sued in negligence. *Haynes v. Franklin*, 95 Ohio St.3d 344, 2002-Ohio-2334, 767 N.E.2d 1146, at ¶ 9. The availability of sovereign immunity is a question of law properly determined by the court prior to trial. *Emmerling v. Mahoning Cty. Bd. of Commrs.*, 7th Dist. No. 15 MA 0165, 2017-Ohio-9066, ¶ 16-17, appeal not allowed sub nom. *Emmerling v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio St.3d 1466, 2018-Ohio-1795, 97 N.E.3d 501, ¶ 16-17 (2018), citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992).

**{¶42}** A three-tiered analysis must be undertaken to determine whether a political subdivision is immune from civil liability. *Hubbard v. Canton City Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶ 10, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 1998-Ohio-421, 697 N.E.2d 610:

> Under the first tier, R.C. 2744.02(A)(1) sets out the general rule that political subdivisions are not liable in damages. [*Greene Cty. Agricultural Soc. v. Liming*, 89 Ohio St.3d 551, 556–57, 733 N.E.2d 1141 (2000)] Under the second tier, the court must determine whether any of the

exceptions to immunity set out in R.C. 2744.02(B) apply. *Id.* at 557, 733 N.E.2d 1141. Finally, under the third tier, if the court finds that any of R.C. 2744.02(B)'s exceptions apply, it must consider R.C. 2744.03, which provides defenses and immunities to liability. *Id.*

*Roberts v. Switzerland of Ohio Local School Dist.*, 2014-Ohio-78, 7 N.E.3d 526, ¶ 17 (7th Dist.).

{¶43} In the present matter, both parties agree that the first tier is met. As such, the school district is entitled to immunity unless one of the exceptions in R.C. 2744.02(B) applies. R.C. 2744.02(B) provides in pertinent part:

(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority.

{¶44} As an employee, McLaughlin is entitled to immunity unless one of three exceptions in R.C. 2744.03(A)(6) applies. Although the law provides that political subdivision employees may be sued individually, the political subdivision generally remains obligated to indemnify and defend its employees pursuant to the terms of R.C. 2744.07, unless certain specifically enumerated exceptions apply.

{¶45} Relevant to this appeal, an employee of a political subdivision is immune from liability unless the employee's acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). "Wanton misconduct" is "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result."

Case No. 17 CO 0026

*Argabrite,* supra, ¶ 8, citing *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at paragraph three of the syllabus. "Reckless conduct" is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* citing *Anderson* at paragraph four of the syllabus.

IV.     Analysis

A.  Negligence – Brown School Board

**{¶46}** In their first assignment of error, Appellants contend that Dustman's conduct on November 22, 2014 did not constitute negligence:

> The trial court erred in denying Brown Local School District's motion for summary judgment as it is immune.

**{¶47}** To establish a claim for negligence, the plaintiff must show the existence of a duty, breach of that duty, and an injury resulting proximately therefrom. *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). Duty refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff. *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989). The existence of a duty is a question of law. *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

**{¶48}** Proximate cause requires the event to be a natural or continuing sequence, without which the injury would not have occurred. *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d 585, 575 N.E.2d 828 (1991). Ordinarily, the determination of whether negligent conduct is the proximate cause of an injury is a question of fact. *Emmerling v. Mahoning Cty. Bd. of Commrs.,* 7th Dist. No. 15 MA 0165, 2017-Ohio-9066, 101 N.E.3d 988, ¶ 65, appeal not allowed sub nom. *Emmerling v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio St.3d 1466, 2018-Ohio-1795, 97 N.E.3d 501, ¶ 65 citing *Glasco v. Mendelman*, 143 Ohio St. 649, 56 N.E.2d 210 (1944), and *White v. Ohio Power Co.*, 171 Ohio St. 148, 168 N.E.2d 314 (1960).

**{¶49}** As a matter of initial concern, Appellee erroneously asserts that the Ohio

Supreme Court's decision in *Argabrite*, supra, prohibits us from considering the elements of negligence in our political-subdivision immunity analysis. The Court in *Argabrite* opined that the elements of negligence should not be considered when an employee subject to the wanton or reckless standard invokes sovereign immunity. The admonition in *Argabrite* is inapplicable here where the school district's liability is predicated upon Dustman's alleged negligence.

{¶50} Dustman holds a commercial driver's license ("CDL") and, therefore, is a professional driver. (Dustman Depo. 5). Certification and licensure as a professional driver are prerequisites to driving a school bus in Ohio. (*Id.* 5, 9). Appellee asserts that the holder of a commercial driver's license owes a greater duty of care to other motorists than a non-commercial driver.

{¶51} Appellee appears to concede that, if Dustman was a non-commercial driver, she would owe no duty of care to Angione because Dustman had the right-of-way. The phrase "right-of-way" is statutorily defined as the right of a vehicle to proceed uninterruptedly in a lawful manner in the direction in which it is moving, in preference to another vehicle approaching from a different direction into its path. *Rapp v. Sullivan*, 7th Dist. No. 12 MA 227, 2013-Ohio-5378, ¶ 2, quoting R.C. 4511.01(UU)(1).

{¶52} We have held that there must be some evidence that a driver with the right-of-way was driving unlawfully in order to consider the issue of his or her contributory or comparative negligence. See *Lydic v. Earnest*, 7th Dist. No. 02CA125, 2004-Ohio-3194, ¶ 30, citing *Deming v. Osinski*, 24 Ohio St.2d 179, 265 N.E.2d 554 (1970) (reversing trial court's decision that motorcyclist with the right-of-way was required to "look, look effectively and continue to look and otherwise remain alert" in a case where the motorcyclist looked at his friend at the gas station just prior to a car pulling in front of him). "Only after it has been found that the vehicle is not proceeding in a lawful manner, by violating a law or ordinance, does the consideration of the driver's common-law duty to use ordinary care come into play." *Id.* ¶ 32. We have recognized a single exception to the general rule, that is, if the driver with the right-of-way realizes there is a clearly dangerous condition in the right-of-way, but fails to use ordinary care thereafter. *Id.* at ¶ 34.

{¶53} Appellant cites R.C. 4511.21(A), which reads, in pertinent part, "No person

shall operate a motor vehicle * * * at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions[.]" However, Dustman was not charged with any traffic violation. The uncontroverted evidence establishes that U.S. Route 30 was neither icy nor slick in the moments preceding the accident. Accordingly, in the absence of another source of a duty of care, Dustman, who was proceeding lawfully in the eastbound lane of U.S. Route 30, owed no duty to Angione.

{¶54} Appellee relies upon the following evidence to establish a heightened duty of care for CDL drivers in Ohio. In order to obtain a CDL, Dustman attended classes and was required to pass a written examination to obtain her license. (Dustman Depo. 9). The applicable standards for operation of a school bus are contained in the training manual issued by the Ohio Bureau of Motor Vehicles ("OBMV Manual") (*Id.* 10). In addition to studying written rules and standards, Dustman also attended a one-week course to complete behind-the-wheel training. (*Id.* 13). Every six years, Dustman must be recertified in order to maintain her CDL endorsement. In 2013, she attended classes and was provided an updated OBVM Manual. (*Id.* 17-18).

{¶55} At her deposition, Dustman acknowledged the following:

1.   A professional school bus driver has an obligation for the safety of the traveling public around the bus, not just the occupants on the bus. (*Id.* 100).

2.   A professional school bus driver has an obligation to act as a defensive driver. (*Id.*).

3.   The driver of a commercial vehicle should reduce speed to a crawl and stop driving as soon as safety allows when driving on an icy road. (Dustman Depo. 89-90).

4.   The OBVM Manual states that a commercial driver should reduce his or her speed by one-third on a wet road. (*Id.* 88-89).

5.   A professional driver of a commercial vehicle must be able to identify slippery road surfaces, including black ice, which can look "just like a wet road." (*Id.* 91).

6.   Any time the ambient air temperature is below freezing, a

professional driver must be aware of the possibility of black ice. (*Id.*).

7. A professional driver of a commercial vehicle should know about weather advisories and potential weather hazards that might occur while operating the vehicle. (*Id.* 92).

8. A professional driver of a commercial vehicle should know how to check parts of the vehicle for ice formation during frigid weather. (*Id.* 93).

{¶56} Moreover, Dustman's training required her to complete pre-service training sponsored by the Ohio Department of Education. (*Id.* 101). Through her pre-service training, Dustman learned that her responsibilities as a school bus driver include:

1. Operating as a "'defensive driver", that is:
   a. making allowances for the lack of skill, knowledge, and attitudes of other drivers;
   b. knowing that others will make mistakes, expecting them and then attempting to avert any situation which could result in a collision;
   c. expecting the unexpected, assuming the worst, and spotting a potentially dangerous situation long before it occurs; and
   d. identifying specific hazards, changing speed or course to avoid potential hazards, and always leaving an escape route. (*Id.* 102-105).

2. Being aware that special driving situations, like wet roads, will require that a school bus always be driven according to the prevailing conditions. (Dustman Depo. 106).

3. Knowing that sudden braking or dodging is usually a confession of ineptness. (*Id.* 105-106).

Lipian opined that when a professional driver has to "slam on the brakes" and they "can't go left or right", they are, "basically out of control." (Lipian Depo. 75).

Case No. 17 CO 0026

**{¶57}** Based upon the foregoing testimony, as well as the ODMV Manual and educational tools provided to CDL drivers in Ohio, Appellee asserts that Dustman breached her duty of care to Angione due to Dustman's failure to reduce the speed of the bus based on the weather. Appellee argues that Russell's loss of control was reasonably foreseeable based upon the existing road conditions and Dustman's CDL driver's training, and, finally, the speed that the school bus was travelling was a proximate cause of Angione's death.

**{¶58}** "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co.*, 45 Ohio St.3d at 98; see, also, *Huston v. Konieczny*, 52 Ohio St.3d 214, 217, 556 N.E.2d 505 (1990). The Ohio Supreme Court has often stated that the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22-24, citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 680, 693 N.E.2d 271; *Commerce & Industry* at 98; *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).

**{¶59}** The duty element of negligence may be established by common law, by legislative enactment, or by the particular circumstances of a given case. *Id.* citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565, 697 N.E.2d 198 (1998); *Eisenhuth v. Moneyhon*, 161 Ohio St. 367, 119 N.E.2d 440 (1954), paragraph one of the syllabus. However, the Supreme Court has recognized that the concept of "duty" is elusive:

> There is no formula for ascertaining whether a duty exists. Duty ""* * * is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (Prosser, Law of Torts (4th ed.1971) pp. 325-326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined

Case No. 17 CO 0026

concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. (Prosser, Palsgraf Revisited (1953), 52 Mich.L.Rev. 1, 15).' *Id.*, 45 Ohio St.3d at 318, 544 N.E.2d 265, quoting *Weirum v. RKO Gen., Inc.* (1975), 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 539 P.2d 36. See, generally, *Palsgraf v. Long Island RR. Co.* (1928), 248 N.Y. 339, 162 N.E. 99.

{¶60} There is no case law in Ohio that imposes a heightened duty of care for CDL drivers. In the absence of common law and legislative enactment, we examine the specific facts in this case to determine whether Dustman, as a CDL driver, owed a heightened duty of care to Angione.

{¶61} Appellee argues that the contents of the ODMV Manual and the instructional material that comprise the CDL training program create a heightened duty for CDL drivers in Ohio. However, we have refused in the past to impose a duty of care where the standards contained in a state-issued manual are not mandatory. In *Emmerling*, supra, the estate of a motorcyclist brought a wrongful death action against the county commissioners, alleging that the motorcyclist's fatal accident was the result of improperly-placed road signs. Because the signs in question were not mandated by the Ohio Manual of Uniform Traffic Control Devices, we concluded that the estate had not established that the county owed a duty of care to the motorcyclist.

{¶62} Here, Appellee has not offered any evidence that the standards set forth in the material provided prior to CDL licensure are mandatory or legally enforceable. For instance, there is no evidence or case law that shows a commercial driver could lose his or her CDL, or be cited for a traffic violation, due to his or her failure to drive defensively or failure to make allowances for the lack of skill, knowledge and attitudes of other drivers. The axioms set forth in the OBMV Manual and CDL educational materials are insufficient in and of themselves to establish a duty of care in Ohio.

{¶63} Next, Appellee asserts that commercial vehicles by virtue of their size and weight should carry with them a heightened duty of care. However, despite the fact that commercial vehicles are larger, heavier, and more difficult to stop, they are subject to the same speed limit as non-commercial vehicles.

{¶64} Finally, the maxim that sudden braking or dodging is usually a confession

of ineptness relates to maintaining a safe stopping distance between vehicles. Lipian's conclusion that a commercial driver that slams on the brakes and is unable to move left or right is out of control is wholly inapplicable here, where a vehicle from an opposing lane careened sideways into Dustman's right-of-way on a two-lane highway, flanked on the one side by a guard rail and the other side by an embankment.

**{¶65}** Applying the factors articulated by the Ohio Supreme Court in *Menifee* and its progeny, we conclude that no heightened duty of care should be imposed on commercial drivers in Ohio based on the facts in this case. The imposition of a duty of care is predicated upon the relationship between the plaintiff and the defendant, and the facts here do not establish the type of relationship Ohio law has relied on to impose a duty of care. Angione was not a passenger on the bus or a passenger in a car travelling in front of the bus. These are examples of relationships for which a duty of care has been imposed in Ohio. A heightened duty of care for commercial drivers in Ohio would place some portion of the responsibility for every accident on a commercial driver, simply because he or she has been instructed to be a defensive driver.

**{¶66}** Further, we find that Russell's loss of control and entry into Dustman's right-of-way were not reasonably foreseeable based upon the facts in this case. The testimony of every witnesses present at the scene of the accident immediately after the collision establishes that the roads were neither icy nor slick. The only testimony regarding icy roadways was provided by Trooper Derrington, who testified that his cruiser fish-tailed and the truck in front of him was struggling to stay on the road due to ice. However, Derrington's testimony was based on weather conditions 17 miles west of the scene of the accident. (Derrington Depo. 13). Dustman's uncontroverted testimony establishes that ice began to form on the roads during the time between the accident and Trooper Derrington's arrival at the scene. Finally, to the extent that Appellee relies on the freezing rain advisory, the existence of an advisory does not create a genuine issue of material fact regarding proximate cause, because eyewitness testimony establishes that the roads were not slick or icy.

**{¶67}** In summary, based on existing law and the specific facts in this case, we find that Dustman did not owe a heightened duty of care to Angione simply because she is a commercial driver. There is no relationship between Angione and Dustman for

which Ohio law should recognize a duty. Further, the uncontroverted evidence establishes that a reasonable person would not have foreseen that Russell would lose control of the Ford Taurus based upon existing road conditions. All of the witnesses who were traveling eastbound on U.S. Route 30, including a third-party that was not involved in the collision, testified that a mist/light rain was falling in Minerva prior to the accident, but that the roads were neither icy nor slick.

**{¶68}** Insofar as no heightened duty exists, and based on the law announced in *Lydic*, supra, we find that Dustman was proceeding in a lawful manner, and, as a consequence, she had no common-law duty of care. *Lydic*, 7th Dist. No. 02CA125 at ¶ 32. Further, the facts in this case do not present the exception to the general rule announced in *Lydic*, because there is no evidence that Dustman should have realized there was a clearly dangerous condition in the right-of-way or, in the alternative, that she failed to use ordinary care thereafter. *Id.* at ¶ 34.

**{¶69}** Next, although proximate cause is typically a question of fact, we find as a matter of law that the expert testimony offered to establish that the speed of the bus was a proximate cause of Angione's death is wholly speculative. Lipian offered no opinion as to the probable relationship between the speed of the bus and Angione's death. Although he opined that less energy would have been brought to bear had the bus been travelling at a reduced rate of speed, he did not state that Angione would have probably survived the collision if the bus was travelling at a reduced rate of speed or that the collision probably could have been avoided. Lipian conceded that he was not retained to perform a biomechanical analysis of the accident.

**{¶70}** Because Appellee has failed to demonstrate that Dustman owed a duty of care to Angione, heightened or otherwise, and the expert testimony offered to establish proximate cause is insufficient as a matter of law, we find that Appellant's first assignment of error has merit, the judgment entry of the trial court denying summary judgment on the basis of sovereign immunity is reversed, and summary judgment is entered in favor of the school board.

### B. Wanton or Reckless Conduct – McLaughlin

**{¶71}** In their second assignment of error, Appellants contend that there is no evidence to establish that McLaughlin acted in a wanton or reckless manner:

The trial court erred in denying Tanya S. McLaughlin's motion for summary judgment as she is immune.

**{¶72}** In order to demonstrate employee liability, Appellee must show that McLaughlin's actions constitute wanton or reckless conduct. The Ohio Supreme Court recently recognized that the standards regarding municipal employee liability are rigorous and will be difficult to establish in most circumstances. *Argabrite*, supra, ¶ 8.

**{¶73}** Denial of summary judgment based on allegations of wanton and reckless misconduct in Ohio has been based on the complete failure to notify first responders or a significant delay in notification. For instance, in *Chevalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705, (8th Dist.), two women dragged an intoxicated man to the curb and left him in a pile of leaves on a cold November evening. A witness called 9-1-1 and reported that the man, who ultimately died of hypothermia, was half-naked and snoring. The call-taker coded the incident a priority 2 assignment, which, according to written city policy and procedures, indicated the potential for serious physical harm and required a dispatch time of fifteen minutes or less. *Id.* ¶ 6-8.

**{¶74}** A team of two city dispatchers in the Bureau of Communications Control Section ("CCS") received the assignment. The first dispatcher testified that she believed that the assignment related to an incident involving two women dragging a mannequin to a tree lawn. There was no reference to a mannequin in any part of the record. When the assignment appeared on her screen a second time, she suggested to her counterpart that a sector car could be pulled from another assignment, but she was not aware whether her counterpart acted on the suggestion. *Id.* ¶ 13-14.

**{¶75}** At their respective depositions, both dispatchers testified that they were busy that evening and no sector cars were available. However, when open units were unavailable, city policy required dispatchers to broadcast the incident location and other relevant details over the district channel assignment. If a dispatcher had difficulty assigning a priority 2, the dispatcher was required to request assistance from a sector supervisor or contact a CCS supervisor. When experiencing a large backlog of assignments, the dispatcher was required to advise a sector supervisor, a CCS supervisor and the complainant of potential delays. *Id.* ¶ 9.

**{¶76}** The dispatchers in *Chevalia* admitted that they were aware of the city

Case No. 17 CO 0026

policies, but did not undertake any of the foregoing protocol in an effort to send assistance. *Id.* ¶ 20, 39. Both dispatchers further conceded that a priority 2 assignment indicates the potential for serious physical harm, and, an intoxicated man, exposed and asleep, could suffer physical injuries on a November evening. *Id.* ¶ 42. Although neither of the dispatchers could remember if or when the zone car was dispatched, the record established that a zone car arrived just short of two hours after the 9-1-1 call was made. *Id.* ¶ 19.

{¶77} The Eighth District affirmed the decision of the trial court, finding that genuine issues of material fact precluded summary judgment on the issues of wanton and reckless conduct, writing:

> Other than to state that they were "busy" and "cannot recall" what happened to the assignment, the dispatchers could not explain why no units were dispatched to the assignment for nearly two hours and could not explain why, if no units were available for dispatch or they were otherwise having dispatching difficulties, they did not broadcast the incident location and other relevant details over the district channel assignment or notify a sector supervisor or CCS supervisor of these difficulties as required under the dispatching assignment policy so that a decision could be made whether a zone car should be pulled off another assignment or other steps taken to obtain a prompt response to the call.

*Id.* ¶ 43.

{¶78} The Eighth District has likewise found questions of fact relating to recklessness when a dispatcher fails to gather relevant information. In *Lyons v. TeamHealth Midwest Cleveland*, 8th Dist. No. 96336, 2011-Ohio-5501, an eight-year-old boy died after suffering breathing problems and a fever that led to cardiac arrest. Jones, the Sheriff's Department dispatcher, was not able to directly connect the emergency caller to the private ambulance company that serviced the county, so he terminated the emergency call and called the private ambulance service on another line. *Id.* ¶ 5.

{¶79} Jones admitted that he was given a street address and a call back

number, but failed to ask the caller for the city in which the street was located. He further admitted that he incorrectly guessed that the street address was closer to one ambulance location than another. The private ambulance company dispatcher testified that she would have determined the exact location of the address if Jones had admitted that he did not know the city where the address was located. *Id.* ¶ 13. As a consequence, the ambulance was dispatched to Allen Street in Salem, Ohio instead of Allen Street in Lisbon, Ohio. The error was corrected through happenstance, and the ambulance arrived more than one-half of an hour after the initial 9-1-1 call was placed. *Id.* ¶ 16.

**{¶80}** Because Jones failed to ask the caller for the city in which the address was located, and he guessed that it was located in Salem, the Eighth District concluded that there was a genuine issue of fact whether Jones's conduct was reckless. The Eighth District predicated its decision on testimony from other 9-1-1 dispatchers that they never guessed about relevant information, as well as the testimony of the private ambulance company dispatcher that she would have ascertained the correct city if she knew the information that Jones had provided was in doubt. *Id.* ¶ 64.

**{¶81}** After discussing the foregoing cases, the trial court provided the following analysis of McLaughlin's conduct:

> As to [McLaughlin], this Court finds that reasonable minds could reach differing conclusions as to whether she crossed the fine line and acted wantonly and recklessly, just as in Lyons and Chevalia. * * * * McLaughlin knew of the accident and that there might be a fatality "in the other car." Upon transferring the call, [McLaughlin] did not, however, advise the [OSHP] dispatcher that a fatality was involved. She also did not listen as [Tucci] gave the same accident information to [OSHP], as is represented in the Defendants' motion for summary judgment. In her deposition, [McLaughlin] clearly testified that she did not stay on the line when [Tucci] was speaking with [OSHP] about the accident.
>
> Nor did McLaughlin follow the directive obligating her to send emergency responders, including fire and EMS, in response to an emergency call

Case No. 17 CO 0026

before transferring the call to [OSHP]. She believed that it was not her responsibility to do so. The result of a disciplinary process against [McLaughlin] included a Group III, Number 2 violation, which is defined as wanton or willful neglect in the performance of required duties.

7/24/17 J.E., p. 18-19.

**{¶82}** "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.*, citing *Anderson* at paragraph three of the syllabus. McLaughlin forwarded Tucci's call to OSHP, in conformance with the procedures outlined in the 9-1-1 Manual. Therefore, McLaughlin took some action with regard to Tucci's call, despite the fact that it was insufficient action.

**{¶83}** Further, there is no evidence in the record to show that McLaughlin was aware that there was a great probability that harm would result. The uncontroverted testimony before us establishes that she did not know about the 2011 Sheriff's policy and believed that OSHP's jurisdiction over the matter included dispatching emergency services. *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977); see also Black's Law Dictionary 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

**{¶84}** Appellee relies on the fact that McLaughlin was cited in her written reprimand from the County for "wanton and willful neglect in the performance of required duties." However, the County's invocation of the term "wanton" is insufficient to create a genuine issue of material fact regarding employee liability based on the facts in this case. "Wanton" is a legal term of art, subject to a specific definition in Ohio, and, as previously stated, the evidence in the record does not establish that McLaughlin's conduct meets the demanding legal standard.

**{¶85}** Moreover, the Ohio Supreme Court has observed that "the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at ¶ 37. The Court explained:

Case No. 17 CO 0026

In order that the breach of [a] statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result.

2 Restatement of the Law 2d, Torts (1965) 587, Section 500, cmt. e.

Thus, as we concluded in *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, "[w]ithout evidence of an accompanying knowledge that the violations 'will in all probability result in injury,' [*Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994)], evidence that policies have been violated demonstrates negligence at best." Id. at ¶ 92.

*Anderson* at ¶ 38.

{¶86} Here, the evidence establishes that McLaughlin believed OSHP would tone out emergency services. Although her violation of departmental policy is established by the facts in the record, her concomitant knowledge that the violation would in all probability result in injury is not. "Without evidence of that knowledge, evidence of a policy violation demonstrates negligence at best." *Argabrite* ¶ 21, citing *O'Toole,* supra.

{¶87} The Ohio Supreme Court has defined "reckless conduct" as conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* citing *Anderson* at paragraph four of the syllabus. McLaughlin testified that she believed that OHSP was responsible for toning out emergency services. Appellee has not offered any evidence to show that McLaughlin was aware of her responsibility to tone out emergency services or that OSHP did not have the ability to tone out emergency services.

{¶88} Unlike the evidence against the dispatchers in *Chevalia*, there is no genuine issue of material fact here with respect to the element of conscious disregard of

Case No. 17 CO 0026

a known or obvious risk. The *Chevalia* dispatchers testified that they were aware of their responsibilities pursuant to city policy and aware of the grave danger presented by the facts in that case. Just the opposite is true here. McLaughlin was unaware of her responsibility to tone out emergency services, and, as a consequence, was incapable of consciously disregarding a known and obvious risk.

**{¶89}** Further, McLaughlin acted in complete accord with the 9-1-1 Manual. The lower court placed considerable emphasis on the fact that McLaughlin did not advise the OSHP dispatcher that there was a fatality, or stay on the line and listen as Tucci provided the accident information to OSHP. However, she was not required to stay on the line or provide any information to OSHP according to the 9-1-1 Manual. Under the caption "Processing Calls for Other Jurisdictions," the 9-1-1 Manual reads, in pertinent part, "Call-taker will advise the caller to stay on the line, initiate the transfer and stay on the line *until voice contact* is made between the receiving PSAP or agency and caller." (9-1-1 Manual, p. 4 (emphasis added)).

**{¶90}** The evidence in the record establishes that McLaughlin was unaware of the Sheriff's memo, and, as a consequence, was unaware of her responsibility to dispatch emergency services regardless of jurisdiction. Appellee has not cited any evidence in the record to establish that the Sheriff regularly posted updates to the 9-1-1 manual on the bulletin board, or that County employees were obliged as a part of their employment to consult the bulletin board for updates.

**{¶91}** "[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." *Fabrey v. McDonald Village Police Department*, 70 Ohio St.3d 351, 1994-Ohio-368, 639 N.E.2d 31. Likewise, reckless conduct requires conscious disregard of a known or obvious risk to another and is "substantially greater than negligent conduct." *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990), adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); see also Black's Law Dictionary 1298-1299 (8th Ed.2004)(explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm). There is no evidence of consciousness of duty or risk to Angione in the record.

Case No. 17 CO 0026

**{¶92}** Because the evidence establishes that McLaughlin took some action, and was unaware of both her responsibility to tone out emergency services, and any risk to Angione, we find that there is no evidence that her conduct was wanton or reckless. Accordingly, we find that Appellant's second assignment of error has merit, and that summary judgment in favor of McLaughlin is appropriate on the basis of sovereign immunity.

V.    Conclusion

**{¶93}** Based on the facts in the record, and the law relating to motorists with the right-of-way, we find that Dustman owed no duty of care, heightened or otherwise, to Angione, and, therefore, the school board is immune from suit. We further find that the expert testimony offered to establish a genuine issue of material fact relating to the element of causation is wholly speculative.

**{¶94}** Next, we find that McLaughlin's conduct was neither wanton nor reckless, insofar as she immediately turned the call over to OSHP, and she was unaware of her responsibility to tone out emergency services. As a consequence, we find that McLaughlin is also immune from suit.

**{¶95}** Accordingly, we find that both of Appellants' assignments of error have merit. The judgment entry of the trial court is reversed and summary judgment is granted in favor of the school board and McLaughlin.

**Donofrio, J., concurs.**

**Waite, J., concurs.**

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is reversed and summary judgment is granted in favor of Appellants, Brown Local School District and Tanya McLaughlin.  Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**